**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 21-1276, 21-1277, 21-1289
_____

CRYSTALLEX INTERNATIONAL CORPORATION

v.

BOLIVARIAN REPUBLIC OF VENEZUELA

CITGO PETROLEUM CORPORATION; PDV HOLDING,
INC.; PETROLEOS DE VENEZUELA, S.A.,
(Intervenors in D.C.)

Citgo Petroleum Corporation and PDV Holding, Inc.,
Appellants in No. 21-1276

Petróleos De Venezuela, S.A.,
Appellant in No. 21-1277

Bolivarian Republic of Venezuela
Appellant in No. 21-1289
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1-17-mc-00151)

District Judge: Honorable Leonard P. Stark
_____

Argued: December 7, 2021

Before: SHWARTZ, PORTER, and FISHER,
*Circuit Judges*.

(Filed: January 18, 2022 )
_____

Nathan P. Eimer
Lisa S. Meyer
Gregory M. Schweizer
Eimer Stahl LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

Robert E. Dunn
Eimer Stahl LLP
99 South Almaden Blvd.
Suite 642
San Jose, CA 95113

     *Counsel for Intervenor-Appellants CITGO Petroleum
     Corporation and PDV Holding, Inc.*

Joseph D. Pizzurro
Kevin A. Meehan
Julia Mosse
Juan O. Perla
Curtis Mallet-Prevost Colt & Mosle

101 Park Avenue
35th floor
New York, NY 10178

     *Counsel for Intervenor-Appellant Petróleos de Venezuela, S.A.*

Donald B. Verrilli, Jr. **[ARGUED]**
Brendan B. Gants
Elaine J. Goldenberg
Ginger D. Anders
Munger Tolles & Olson
601 Massachusetts Avenue, N.W.
Suite 500
Washington, D.C. 20001

     *Counsel for Defendant-Appellant Bolivarian Republic of Venezuela*

Robert L. Weigel
Rahim Moloo
Jason W. Myatt
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Miguel A. Estrada **[ARGUED]**
Lucas C. Townsend
Matthew S. Rozen
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

Travis S. Hunter
Jeffrey L. Moye
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801

> *Counsel for Plaintiff-Appellee Crystallex International Corporation*

_____

OPINION OF THE COURT
_____

PORTER, *Circuit Judge*.

In these consolidated appeals, the Bolivarian Republic of Venezuela ("Venezuela") and other appellants ask us to intervene for a second time in ongoing execution proceedings against Venezuela. Our jurisdiction to hear the appeals turns on whether the District Court has reached a final decision. 28 U.S.C. § 1291. It has not, so we lack jurisdiction over these appeals.

I

A decade ago, Venezuela expropriated valuable mining rights owned by Crystallex International Corporation ("Crystallex"), a Canadian mining company. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 132 (3d Cir. 2019). After prevailing in an arbitration proceeding, Crystallex asked a federal district court to confirm the award and obtained a $1.4 billion judgment. *Id.* at 133. Crystallex has since been trying to collect. *Id.* at 133–35.

4

In the execution action before the District Court, Crystallex seeks to auction shares owned by Venezuela's state-owned energy company, Petróleos de Venezuela, S.A. ("PDVSA"), to satisfy its judgment against Venezuela. *Id.* at 134. At stake are PDVSA's shares in PDV Holding, Inc. ("PDVH"), a Delaware holding company that owns CITGO Petroleum Corporation ("CITGO"), a U.S. petroleum refiner. *Id.* at 132.[1] Venezuela and PDVSA oppose the auction, as a sale would end PDVSA's control over CITGO, one of PDVSA's most important assets in the United States.

A

In an earlier round of proceedings, Crystallex sought to seize PDVH's shares through a "writ of attachment" under Delaware law, as allowed by Federal Rule of Civil Procedure 69(a). *Id.* at 134. PDVSA intervened and resisted the attachment on grounds of sovereign immunity. *Id.*

The District Court rejected PDVSA's defenses after careful consideration. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 406, 418 (D. Del. 2018), *aff'd and remanded*, 932 F.3d 126 (3d Cir. 2019). Among other things, the District Court held that it had ancillary jurisdiction to enforce the judgment against Venezuela in this execution proceeding, and that PDVSA could not assert its own sovereign immunity as a defense because PDVSA was Venezuela's alter ego under federal common law. *Crystallex*

---

[1] PDVSA, a Venezuelan corporation, wholly owns PDVH, a Delaware holding corporation, which wholly owns CITGO Holding, Inc., which wholly owns CITGO Petroleum.

*Int'l Corp.*, 333 F. Supp. 3d at 399, 406. In other words, while PDVSA, not Venezuela, is the nominal owner of the PDVH shares, the District Court concluded that given Venezuela's history of extensive control over PDVSA, PDVSA *is* Venezuela for purposes of this suit. *Id.* at 393, 399. Some days later, the District Court issued the writ of attachment, ordering PDVH's registered agent to retain the stock until further order.

PDVSA appealed, and Venezuela intervened. *Crystallex Int'l Corp.*, 932 F.3d at 134. In that earlier appeal, we agreed with the District Court's reasoning, rejected all of PDVSA's immunity defenses, and affirmed the District Court's orders, including the writ of attachment. *Id.* at 151–52. The Supreme Court denied certiorari, and the case returned to District Court. *Bolivarian Republic of Venezuela v. Crystallex Int'l Corp.*, 140 S. Ct. 2762 (2020).

B

While the case was pending on appeal, political conditions in Venezuela changed. In January 2019, following a fraudulent reelection bid a year earlier, Nicolás Maduro tried to install himself as President of Venezuela for a second term. The Venezuelan National Assembly, an elected body, invoked Venezuela's constitution and declared Juan Guaidó interim president. The United States recognized Juan Guaidó as the legitimate interim President of Venezuela, but Maduro still clings to power.

"[I]n light of the continued usurpation of power by Nicolas Maduro," then-President Trump broadened existing economic sanctions against Venezuela and blocked any transfer or dealing in PDVSA's property. Exec. Order No. 13,884,

6

§§ 1, 6 (Aug. 5, 2019), 84 Fed. Reg. 38,843 (Aug. 7, 2019). Implementing this order, the Office of Foreign Assets Control ("OFAC"), an agency that administers U.S. economic sanctions, published the following rule:

> [T]he entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to [regulation], is prohibited unless authorized pursuant to a specific license issued by OFAC.

84 Fed. Reg. 64,415, 64,417 (Nov. 22, 2019), *codified at* 31 C.F.R. § 591.407. OFAC's rule looms large in this case.

### C

On remand, PDVSA, now joined by PDVH as the garnishee and CITGO as an intervenor, asked the District Court to quash the writ of attachment. In an argument that raised the District Court's sense of déjà vu, they sought to litigate the alter ego status of PDVSA once again, arguing this time that Delaware alter ego law controlled.[2] Delaware law requires showing fraud—not just extensive control—to seize the prop-

---

[2] Before it lost its prior appeal to this Court, PDVSA conceded that "the legal standard for alter-ego . . . applied in this case [is] federal common law." J.A. 144; *see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983) (holding that federal common law, not state law, governs the alter ego status of foreign instrumentalities).

erty of a non-debtor like PDVSA. *See Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."). And Crystallex, they argued, has not made that showing.

Crystallex, on the other hand, viewed the attachment's validity as a settled matter and moved for a contingent auction of PDVSA's shares pending a license from OFAC. Venezuela, PDVSA, and PDVH opposed, arguing that OFAC's regulations prohibit a contingent sale and urging the District Court to stay sale proceedings until Crystallex obtains an OFAC license.

D

On the eve of the District Court's hearing on the pending motions, the United States filed a statement of interest urging the District Court not to authorize a contingent sale of the shares. Elliot Abrams, the U.S. Special Representative for Venezuela at the time, filed a letter asserting that "immediate steps toward a conditional sale" of CITGO would damage the legitimacy of the Guaidó government. J.A. 309. Abrams explained that CITGO's "loss through a forced sale in a U.S. court would be a great political victory for the Maduro regime," as Maduro could blame the Guaidó government for the loss of PDVSA assets on U.S. soil. J.A. 309. This, Abrams said, would "greatly" harm U.S. foreign policy interests. J.A. 309.

The United States, through OFAC, separately argued that "U.S. sanctions involving Venezuela require a license for

8

any sale of PDVH shares." J.A. 300. The United States noted that OFAC was then considering Crystallex's specific license application and asked the District Court to "refrain from authorizing an auction and sale of Venezuela's largest and most important foreign asset while Crystallex's licensing application is pending before OFAC." J.A. 304.[3]

At the hearing on the pending motions, the United States clarified its position in response to the District Court's questions. It assured the District Court that "the United States [w]asn't tak[ing] the position that [the District Court was] blocked from moving forward" and that "the Court can do whatever it wants." J.A. 523. It also clarified, though, that "Crystallex might well be in violation of OFAC regulations if it takes these proposed steps." J.A. 523.

E

On January 14, 2021, the District Court acted on the pending motions. The District Court refused to quash the attachment. In the District Court's view, it had already decided the alter ego issue and issued the attachment, and we had affirmed, so (1) issue preclusion prevented PDVSA and its subsidiaries from relitigating the validity of the attachment under Delaware law, and, in any event, (2) the state-law challenge was untimely because PDVSA and its subsidiaries had failed to preserve the issue after an adequate opportunity to do so. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,

---

[3] While these appeals were pending OFAC denied Crystallex's license application, without prejudice if foreign policy considerations change.

9

No. 17-mc-151-LPS, 2021 WL 129803, at *8–11, *12–15 (D. Del. Jan. 14, 2021).

The District Court also granted Crystallex's motion in part. The District Court decided "to set up the sales procedures and then to follow them to the maximum extent that can be accomplished without a specific license from OFAC." *Id.* at *16. The District Court noted, however, that "[a]ll parties agree that, under current law and policy, a sale of PDVH shares cannot be completed without a specific OFAC license." *Id.* With that understanding, the District Court decided that "all the preparatory steps that can be taken without such a license can, and should, be taken." *Id.* The District Court also "set out some of the contours of the sales procedures that it will follow"— including appointing a special master to aid the District Court in designing procedures for an eventual judicial sale. *Id.* at *17–18.

Venezuela, PDVSA, PDVH, and CITGO appealed the order.

II

We have "jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "A final decision ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Hall v. Hall*, 138 S. Ct. 1118, 1123–24 (2018) (quotation marks omitted).

The Venezuela appellants seek review of two decisions. They first ask us to review the District Court's refusal to quash the attachment, arguing that the attachment must be quashed because it conflicts with Delaware alter ego law. They also ask

us to review the District Court's decision to determine final sale procedures in the future, arguing that it conflicts with OFAC regulations and disregards U.S. foreign policy interests. Neither decision is final, so we lack authority to entertain these arguments.

## A

We first address whether the District Court's refusal to quash the attachment is a final decision. We consider—and reject—Crystallex's argument that refusals to quash post-judgment attachments are never final. We hold instead that an attachment in aid of execution, or a refusal to quash one, is final when "all that remains is for a non-judicial officer to take and dispose of the defendant's property." *United States v. Parker*, 927 F.3d 374, 380 (5th Cir. 2019). We lack jurisdiction over the refusal to quash under that practical test because the litigation remains ongoing. The District Court must, at the very least, still rule on pending legal objections to the special master's recommended judicial sale procedures. The District Court's judicial involvement is ongoing, so the refusal to quash the attachment is interlocutory. Venezuela and other appellants will have an adequate opportunity to appeal the refusal to quash the attachment at a later stage, so there is no practical finality.

## 1

### a

"The archetypal final decision is one that triggers the entry of judgment." *Hall*, 138 S. Ct. at 1124 (quotation marks and alterations omitted). When a party files an appeal from a final decision disposing of all claims, our jurisdiction

11

ordinarily presents no difficult question. *Id.* Orders that precede a final disposition of claims are, on the other hand, usually interlocutory and unappealable unless Congress says otherwise. *See* 28 U.S.C. § 1292. "The general rule [is] that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (citation omitted). Faithful adherence to the single appeal rule promotes clear jurisdictional rules, allows district judges room to manage complex litigation, and avoids the costs of piecemeal appeals.

The single appeal rule prevents appellate review of many important litigation decisions that affect property rights. That includes prejudgment attachments or similar remedies under Rule 64 "to secure satisfaction of the *potential* judgment." Fed. R. Civ. P. 64(a) (emphasis added). A prejudgment "[a]ttachment is an ancillary remedy by which a plaintiff acquires a lien upon the property of a defendant in order to obtain satisfaction of a judgment that the plaintiff may ultimately obtain at the conclusion of the litigation." *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994). These kinds of remedies are "intended to preserve the subject-matter in dispute from waste or dilapidation, and to keep it within control of the court until the rights of the parties concerned can be adjudicated by a final decree." *Forgay v. Conrad*, 47 U.S. (6 How.) 201, 204–05 (1848). They are necessarily "interlocutory," as they merely allow litigation to continue toward a final decision. *Id.* at 204.

For this reason, orders granting or refusing to vacate prejudgment attachments have long been held unappealable. In *Cushing v. Laird*, the Supreme Court held that a foreign attachment on a vessel was not final, as an "attachment is auxiliary

12

and incidental to the principal cause," which was yet to be litigated. 107 U.S. 69, 76 (1883).[4] "Neither the principal defendant nor the garnishees can appeal until after a final decree against them." *Id.* The Supreme Court later cited *Cushing* with approval, noting that unlike in a case denying an attachment, "where an attachment is upheld pending determination of the principal claim . . . the rights of all the parties can be adequately protected while the litigation on the main claim proceeds." *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 689 (1950).

Appeals from prejudgment attachments and similar remedies have "shatter[ed] on the rock" of these Supreme Court precedents. *West v. Zurhorst*, 425 F.2d 919, 921 (2d Cir. 1970) (Friendly, J.). In *United States v. Pearce's Estate*, for example, we held a "sequestration order" seizing stock—a device we said was "analogous to foreign attachment at law"—unappealable. 498 F.2d 847, 849 (3d Cir. 1974) (en banc). We found no finality because liability was still to be adjudicated and "[i]n essence, all that ha[d] happened to date is that shares of stock ha[d] been seized." *Id.* at 850. In *Petroleos Mexicanos Refinacion v. M/T King A (Ex-Tbilisi)*, we similarly held a refusal to vacate a "warrant of arrest" for a vessel—another device analogous to attachment—not final, because "the arrest itself is not the immediate precursor to execution of a judgment." 377 F.3d 329, 334 (3d Cir. 2004). The refusal to vacate the warrant of arrest was also unappealable under the collateral-order doctrine, we held, based on "our long-

---

[4] The purposes of a foreign attachment are "to secure a respondent's appearance and to assure satisfaction in case the suit is successful." *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950).

established precedent from an analogous area"—cases involving "*pre*judgment attachments." *Id.* at 336 (emphasis added). Thus, orders granting or refusing to vacate Rule 64 remedies are not final decisions and immediate appeals are barred unless the law allows an interlocutory appeal. *See, e.g.*, 28 U.S.C. § 1292(b).

Crystallex asks us to extend these prejudgment precedents to post-judgment attachments in aid of execution under Rule 69(a). Fed. R. Civ. P. 69(a). But post-judgment attachments are different. Post-judgment attachments are used to satisfy a final judgment by seizing and selling property. They come after, not before, an archetypal final decision. So they do not lend themselves to the single appeal rule we usually apply to property seizures that precede a final decision on liability, including prejudgment attachments under Rule 64. In an execution proceeding, there has already been at least one opportunity to appeal the final decision on the merits. There cannot be just one "final decision."

The better analogy is not attachments under Rule 64, but other execution process awarded under Rule 69 or Rule 70, like a writ of execution directing "the marshal to not only levy but also to sell the property." *Parker*, 927 F.3d at 380. Like a writ of execution and unlike a prejudgment attachment, a post-judgment attachment may sometimes be "the immediate precursor to execution of a judgment." *Petroleos Mexicanos*, 377 F.3d at 334. When an execution sale immediately follows an attachment, the district court's judicial involvement in the civil action is over, and all that is left is a ministerial superintending of the sale. These kinds of post-judgment decisions are "often appealable" under our precedent. *Isidor Paiewonsky Assocs., Inc. v. Sharp Props., Inc.*, 998 F.2d 145, 149 (3d Cir. 1993).

b

Crystallex argues, however, that nineteenth-century Supreme Court precedent requires us to hold that refusals to quash attachments are *never* final. Crystallex's reading of precedent is anachronistic, so we decline to follow that path.

Crystallex's main authority is *Boyle v. Zacharie* (*Boyle II*), 31 U.S. (6 Pet.) 648 (1832) (Story, J.). In *Boyle*, the U.S. circuit court for the district of Maryland—a trial court in diversity cases—entered a money judgment for Louisiana creditors against Hugh Boyle, a Baltimore merchant. *Boyle v. Zacharie* (*Boyle I*), 31 U.S. (6 Pet.) 635, 641–42 (1832) (Story, J.).[5] The court ordered an attachment, and the U.S. marshal seized Boyle's ship, the *General Smith*. *Id.* at 642. The court later issued "a writ of venditioni exponas"—an order requiring the U.S. marshal to sell the *General Smith*. *Boyle II*, 31 U.S. at 655. Boyle moved to quash the sale order, arguing that a pending proceeding in equity required staying any sale, but the court denied Boyle's motion to quash. *Id.* Boyle then took his case to the Supreme Court under section 22 of the Judiciary Act of 1789, authorizing a "writ of error" from "final judgments and decrees." Judiciary Act of 1789, ch. 20 § 22, 1 Stat. 73, 84; *see also Boyle II*, 31 U.S. at 656.

The Supreme Court addressed "whether a writ of error" could be brought to review the refusal to quash the sale "upon mere motion." *Boyle II*, 31 U.S. at 656. "In modern times," Justice Story noted, "courts of law will often interfere by sum-

---

[5] Under the Judiciary Act of 1789, U.S. circuit courts had original jurisdiction in diversity of citizenship cases like *Boyle*. Judiciary Act of 1789, ch. 20, 1789, § 11, 1 Stat. 73, 78.

15

mary proceedings on motion, and quash an execution erroneously awarded," instead of correcting a judgment through formal post-judgment writs. *Id.* But quashing execution by summary motion was a matter of judicial "discretion," not a legal "judgment." *Id.* at 657. As Justice Story explained:

> We consider all motions of this sort to quash executions, as addressed to the sound discretion of the court; and as a summary relief, which the court is not compellable to allow. The party is deprived of no right by the refusal; and he is at full liberty to redress his grievance by writ of error [coram nobis], or audita querela; or other remedy known to the common law. The refusal to quash, is not in the sense of the common law a judgment, much less a final judgment. It is a mere interlocutory order.

*Id.*[6] *Boyle*, properly understood, was tied to review by writ of error. The writ of error was far more limited than the civil appeal. Chief Justice Oliver Ellsworth, the primary author of the Judiciary Act, explained it this way: "An appeal is a process of civil law origin, and removes a cause entirely; subjecting the

---

[6] An audita querela was a suit by a judgment debtor to present a defense to a judgment that could not have been raised earlier, and coram nobis was similar. *See* James Wm. Moore & Elizabeth B.A. Rogers, *Federal Relief from Civil Judgments*, 55 Yale L.J. 623, 659–74 (1946) (explaining the writs). The appellate writ of error should not be confused with the post-judgment writ of error coram nobis, as coram nobis was a writ asking a court to set aside its own judgment because of an error of fact. *Id.* at 669.

fact as well as the law, to a review and re-trial: but a writ of error is a process of common law origin, and it removes nothing for re-examination but the law." *Wiscart v. D'Auchy*, 3 U.S. (1 Dall.) 321, 327 (1796). One of the writ of error's settled limitations was that it could not be used to review discretionary orders. *See Boyle II*, 31 U.S. at 657 (citing cases). As Chancellor James Kent put it, "[t]here seems to be no position more uniformly admitted, than that [a writ of] error will not lie on a matter resting in discretion." *Clason v. Shotwell*, 12 Johns. 31, 49 (N.Y. 1814); *see also* Alfred Conkling, *A Treatise on the Organization and Practice of the Courts of the United States* 672 (3d ed. 1856) ("A writ of error will not . . . lie for an alleged error in deciding upon an application addressed to the discretion of the court . . .").

By the time *Boyle* was decided, the New York Supreme Court had already concluded that orders on motions to quash execution were discretionary and so unreviewable by writ of error. *Brooks v. Hunt*, 17 Johns. 484, 486–87 (N.Y. Sup. Ct. 1820). Justice Story agreed. Under the forms of action, "summary proceedings on motion" to quash execution are decided "in the exercise of [] sound discretion," not as of matter of legal right. *Boyle II*, 31 U.S. at 656. At the time, "it [was] by no means uncommon for the court to refuse to interfere upon motion," even "where the [execution] proceedings [were] clearly erroneous," and require the filing of a post-judgment writ. *Id.*

Courts had good reason to refuse meritorious motions to quash. Unlike post-judgment writs, orders on motion to quash execution did not vacate judgments and had little finality. *McCargo v. Chapman*, 61 U.S. (20 How.) 555, 556 (1857). Because orders on motions to quash execution did not have

17

preclusive effect on future executions, review of these orders by writ of error would not settle legal rights with finality. *Id.* at 556–57. *Boyle* must be understood in this procedural context.

Having placed *Boyle* in its proper procedural context, we now address Crystallex's reading of *Boyle*. Crystallex's argument that *Boyle* and its progeny hold that refusals to quash attachments are unappealable has no basis in *Boyle*. *Boyle*, for starters, involved a sale order, not an attachment. *Boyle II*, 31 U.S. at 655 ("[N]o error is assigned on the original judgment, or on the award of the [attachment.]"). The other authority cited by Crystallex is *Loeber v. Schroeder*, 149 U.S. 580 (1893). But *Loeber* merely applied *Boyle*'s rule that "an order overruling a motion to quash an execution"—in that case a post-judgment attachment—was not a judgment reviewable by writ of error. *Id.* at 584–85 (citing *Boyle II*, 31 U.S. at 657); *see also Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 331–32 (1838) (same). So *Loeber* adds nothing to *Boyle*.

Moreover, contrary to Crystallex's suggestion, nothing in *Boyle* or *Loeber* turned on the outcome being a *refusal* to quash. In *McCargo*, for example, the Supreme Court had no difficulty applying *Boyle*'s holding to dismiss a writ of error brought from an order quashing a post-judgment attachment. *McCargo*, 61 U.S. at 557 ("In this case, the Circuit Court quashed the execution."). Nor did *Boyle* categorically forbid a writ of error. *Boyle* said courts could review an "erroneous" execution award. *See Boyle II*, 31 U.S. at 656 ("If, therefore, there is an erroneous award of execution, not warranted by the judgment, or erroneous proceedings under the execution, a writ of error will lie to redress the grievance."); *see also Johnson v. Harvey*, 4 Mass. (4 Tyng) 483, 484 (1808) (providing examples of when a writ of error could be brought against execu-

18

tion). Neither *Boyle* nor *Loeber* involved a situation where, as here, a party complains that execution was erroneously awarded against the wrong party, and Crystallex cited no analogous caselaw. This alone distinguishes those cases.

*Boyle* and *Loeber*, in short, turned on the limited scope of the writ of error. But Congress "abolished" the writ of error in 1928 and replaced it with the appeal. Act of Jan. 31, 1928, ch. 14, 45 Stat. 54 ("That the writ or error in cases, civil and criminal, is abolished. All relief which heretofore could be obtained by writ of error shall hereafter be obtainable by appeal."); Erwin C. Surrency, *History of the Federal Courts* 305 (2d ed. 2002) (noting the demise of distinctions between the writ of error and the appeal). Appeals were not new. Before 1928, appeals were common on the equity side of federal courts and allowed for broad review of "facts as well as law" on appeal from a final decree. *Buessel v. United States*, 258 F. 811, 814 (2d Cir. 1919). Post-judgment decrees in equity were reviewable for abuse even if they were discretionary. *In re Farmers' Loan & Tr. Co.*, 129 U.S. 206, 215–16 (1889).

Whatever substantive distinction remained between appeals in equity and law after 1928 ended in 1938. The Federal Rules of Civil Procedure merged law and equity by replacing the forms of action and bills with "one form of action—the civil action." Fed. R. Civ. P. 2. And the post-judgment writs referenced in *Boyle* were "abolished" by Rule 60 a few years later. Fed. R. Civ. P. 60(e). Civil actions and motions, not writs "shrouded in ancient lore and mystery," are now the exclusive way to seek relief from execution proceedings in federal district court. Advisory Comm. on Rules of Civ. Proc., Report of the Proposed Amendments to Rules of Civil Procedure for the District Courts of the United States (1946), *reprinted in* 5

19

F.R.D. 433, 476. While rules of procedure cannot alter our jurisdiction, "many of the procedural rules of the district courts unquestionably affect [our] jurisdiction" by altering when district court orders can be considered final decisions. *Bendix Aviation Corp. v. Glass*, 195 F.2d 267, 271 (3d Cir. 1952) (en banc) (upholding Rule 54(b)).

Crystallex does not explain why *Boyle* and *Loeber* have continued relevance under modern civil procedure. As Crystallex acknowledges, courts of appeals often hear appeals from final sale orders—like the order at issue in *Boyle*. "[P]ost-judgment orders are often appealable," we have said. *Sharp Props.*, 998 F.2d at 149. Or as the Fifth Circuit recently explained, "[o]rders permitting enforcement of judgments or requiring defendants to transfer property to plaintiffs might not take the form of judgments, but they certainly dispose of claims to that property. And these types of orders have long been treated as final and appealable." *Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 741–42 (5th Cir. 2020) (citing cases, including *Boyle II*, 31 U.S. at 656).

Given the merger of law and equity and the abolition of the forms of action, our appellate jurisdiction is not limited to those "judgments" that would have been reviewable by writ of error in the law courts of Westminster. We have allowed appeals from many orders that likely would not have been "judgments" under the technical rules of the writ of error. In *Sharp Properties*, for example, we held that a writ of assistance ejecting a non-party tenant under Rule 70 was an appealable final decision, not an unappealable "ministerial or administrative act." 998 F.2d at 151. Even more telling, the Supreme Court now allows appeals from orders vacating *pre*judgment attachments by motion, which may well have been

20

unreviewable by writ of error at common law. *Compare Compania Colombiana Del Caribe*, 339 U.S. at 688–89 (allowing appeal from an order vacating foreign attachment by motion), *with McCargo*, 61 U.S. at 558 (rejecting a writ of error from an order quashing attachment by motion). And as we have explained, *Boyle* merely applied the general rule that discretionary orders were unreviewable by writ of error. *Clason*, 12 Johns. at 49. But the federal reporters are chock-full of appeals reviewing orders for abuse of discretion. Those precedents sit uneasily with *Boyle* and *Loeber*.

By contrast, there are no well-reasoned decisions applying *Boyle* and *Loeber* to reject an appeal after 1938. *See* 15B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3916 n.8 (2d ed. 1992) ("Wright & Miller") (characterizing *Boyle* as the "old view" of the appealability of execution orders). The few decisions that apply *Boyle* or *Loeber* to dismiss appeals are perfunctory. *See, e.g.*, *United States v. Moore*, 878 F.2d 331, 331 (9th Cir. 1989) (per curiam) (relying on *Loeber* to dismiss without explanation); *Steccone v. Morse-Starrett Prods. Co.*, 191 F.2d 197, 199 (9th Cir. 1951) (same). This silence speaks volumes. Supreme Court decisions under the First Judiciary Act are binding and relevant, but we see no persuasive reason why *Boyle*'s understanding of the writ of error and the discretionary nature of motions to quash execution under the forms of action compels dismissal of these appeals, and Crystallex offers none. In the contest between the writ of error and the civil appeal, as in other areas, "[t]he war between law and equity is over. Equity won." Douglas Laycock, *The Triumph of Equity*, 56 Law & Contemp. Probs. 53, 53 (1993).

We apply our "practical finality" approach to these post-judgment orders. *Sharp Properties*, 998 F.2d at 150. Practical finality, however, does not mean piecemeal review of every post-judgment order en route to a final sale. "Appeal ordinarily should not be available as to any particular post-judgment proceeding before the trial court has reached its final disposition." Wright & Miller § 3916. Generally, the "dispositive question, then, is whether there is anything left for the district court to do with respect to execution of the judgment." *Parker*, 927 F.3d at 380. An execution proceeding is final when "all that remains is for a non-judicial officer to take and dispose of the defendant's property." *Id.* Or as we said in *Sharp Properties*, a post-judgment order is final when it "leaves nothing to be done in the cause save to superintend, *ministerially*, the execution of the decree." 998 F.2d at 150 (quoting *In Re Moody*, 825 F.2d 81, 85 n.5 (5th Cir. 1987)). The key word is "ministerially." This practical test requires us to determine whether the District Court's judicial role is over.

Applying our test, the District Court's judicial role in this civil action is far from over. The District Court is proceeding through a judicial sale, not an execution sale, and the sale process raises several legal questions. To decide judicial sale procedures, for example, the District Court first needs to rule on objections to the special master's proposed judicial sale procedures. The parties have raised multiple legal objections to this proposal and continue to brief legal issues. Venezuela, for example, submitted a district court brief a day after we held oral argument in this appeal arguing that a contingent auction pending an OFAC license would violate sanctions regulations. That is a legal objection calling for the District Court's judg-

ment, not just its ministerial superintendence. More appeals will likely follow the final order on sale procedures.

Appellants raise several pragmatic arguments for finality, but none are persuasive.

Appellants first argue that the pending judicial proceedings are irrelevant to finality because they involve the sale process. The refusal to quash, they say, settled the sole remaining threshold objection to the sale of PDVSA's property as a non-party to the money judgment. In their view, there is no practical reason to defer review of this separate threshold objection. But preventing the "harassment and cost of a succession of separate appeals"—as the law requires—is a fine practical reason to defer review. *Cobbledick v. United States*, 309 U.S. 323, 325 (1940). Threshold affirmative dispositive defenses to liability (like a statute of limitations) are often rejected in interlocutory orders, but their rejection is not immediately appealable. *Digital Equip. Corp.*, 511 U.S. at 873. Disappointed litigants who lose on threshold affirmative defenses must ordinarily wait "until the end of proceedings before gaining appellate review." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 524 (1988). So too here.

Appellants also argue that further proceedings would be wasteful if we later hold the attachment invalid. Perhaps. "But the possibility that a ruling may be erroneous and may impose additional litigation expense is not sufficient to set aside the finality requirement imposed by Congress." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985). This rule is sensible, as we affirm district courts far more often than we reverse them.

Appellants' core argument, however, is that we should discount ordinary principles of finality because post-judgment decisions are more permissive of piecemeal appeals. *Sharp Properties* and other decisions of our Court lend some support to this argument. We have said that "when supplementary post-judgment orders are involved . . . the policy against . . . avoiding piecemeal review [is] less likely to be decisive." *Sharp Properties*, 998 F.2d at 150 (quoting *Ohntrup v. Firearms Ctr., Inc.*, 802 F.2d 676, 678 (3d Cir. 1986)). And in *Ohntrup*, we held a post-judgment denial of a motion to withdraw as counsel immediately appealable even though discovery proceedings in aid of execution remained pending before the District Court. *Ohntrup*, 802 F.2d at 678. But critically, we granted review in that case only because if the lawyers involved had to wait until the execution proceedings were over, they "would . . . be effectively denied meaningful review" of their motion to withdraw. *Id.*

Unlike in *Ohntrup*, Appellants have not shown they will be denied meaningful appellate review unless we intervene now. Appellants argue that unless we intervene now, they will be irreparably injured by a fire sale. But that injury will only materialize if a contingent auction takes place *and they ultimately lose on appeal*, so they have not shown an effective denial of appellate review. If we allowed piecemeal appeals to prevent the risk of mere financial loss occasioned by litigation decisions, "Congress's final decision rule would end up a pretty puny one." *Digital Equip. Corp.*, 511 U.S. at 872.

The risk of a fire sale is also speculative. We do not yet know whether the District Court will order a contingent auction pending OFAC approval (an issue Venezuela continues to vigorously litigate before the District Court), so we have no basis

to assume that a contingent auction will happen anytime soon. Far from it, the special master has recommended *against* commencing the marketing and bidding process until OFAC's position materially changes. Even if the District Court rejects this recommendation and orders a contingent auction, the District Court appears to agree that OFAC's approval would be necessary to complete the transaction and transfer title.

Nor are appellants without a proper remedy: Once the District Court enters a final decision, they may seek a stay of execution pending appeal, preventing an auction from going forward. Fed. R. Civ. P. 62(b), (e); Fed. R. App. P. 8. Stays, not judge-made equitable or foreign-policy exceptions to the jurisdictional requirement of finality, are the proper way to protect appellants from irreparable injury while they raise their legal challenges on appeal.

3

In a conclusory footnote, appellants also argue that the refusal to quash is appealable as a collateral order. This argument lacks merit for the same reason as their finality argument: appellants have not shown that refusals to quash an attachment are effectively unreviewable on appeal later. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108–09 (2009) (an appellant must show that "deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders").

The refusal to quash is not a final decision.

B

Venezuela separately appeals the District Court's decision to "set up the sales procedures and then to follow them to the maximum extent that can be accomplished without a specific license from OFAC." *Crystallex Int'l Corp.*, 2021 WL 129803, at *16. This preliminary order—a decision to determine sale procedures in the future with the advice of a special master—is interlocutory and unappealable.

1

Before addressing our jurisdiction, we pause to explain what the District Court did *not* decide. Appellants say that the preliminary decision on sale procedures "*contemplates* a contingent auction" without prior OFAC approval. Appellants' Opening Br. 44 (emphasis added); *see also* Oral Argument at 14:10–14:44 (asserting the decision requires steps toward a contingent auction). But saying that an order contemplates a contingent auction is an admission that the order is tentative and not final on at least that disputed issue. The District Court docket confirms this. In its briefing before the District Court, Venezuela continues to litigate the legality of a contingent auction and insists that the District Court has yet to decide whether to approve a contingent auction.

Our own review of the January 2021 order confirms that the District Court has not approved a contingent auction. The District Court said it would go only as far as OFAC's regulations allow and acknowledged that OFAC's approval will be needed to complete a sale. The final sale procedures order, not the preliminary decision on appeal, will govern if, when, and

26

how, a sale can begin and end.[7] To be sure, the District Court did not foreclose the possibility of a contingent auction pending OFAC's approval. But neither did it endorse that possibility. That issue will be decided in the final sale procedures order, with the benefit of the special master's recommendations after further briefing. Venezuela's assertion that a contingent auction would violate OFAC's regulations is therefore unripe for resolution in this appeal. *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162–63 (1967). We reject Venezuela's attempt to inject this premature issue into this appeal.

2

The only decision before us, then, is the District Court's decision to begin the process for deciding sale *procedures*. Venezuela argues that we have jurisdiction to review this decision under the collateral-order doctrine. We do not.

---

[7] Appellants read a contingent-sale requirement into the District Court's decision to allow "[t]he winning bidder . . . a reasonable amount of time to pursue any necessary and desirable regulatory approvals." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-mc-151-LPS, 2021 WL 129803, at *17 (D. Del. Jan. 14, 2021). But this part of the order refers to regulatory approvals generally, not OFAC approvals. OFAC is far from the only regulator in Washington, D.C. As Crystallex explained, a winning bidder may need merger approval from the Federal Trade Commission and the Department of Justice before closing the acquisition. *See* 15 U.S.C. § 18a. Similarly, bidders from outside the United States may need approval from the Committee on Foreign Investment in the United States. *See* 50 U.S.C. § 4565.

The collateral-order doctrine is a narrow exception from the general rule that a party is entitled to a single appeal. *Digital Equip. Corp.*, 511 U.S. at 868. It allows appeals from a "small class" of orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). "That small category includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995).

Orders that "substantially overlap" or are intertwined with the "factual and legal issues of the underlying dispute" are not separate from the merits under *Cohen*, "making such determinations unsuited for immediate appeal as of right under § 1291." *Biard*, 486 U.S. at 529. The District Court's preliminary order is not separate from the merits of the pending proceedings. The preliminary order is but a "tentative, informal, [and] incomplete" step on the issue of how far the District Court can go toward a final sale. *Cohen*, 337 U.S. at 546. The District Court will decide how far is too far in the forthcoming order on sale procedures, after further briefing. *Crystallex Int'l Corp.*, 2021 WL 129803, at \*16–17. Venezuela's claim that this preliminary decision to determine sale procedures goes too far will substantially overlap with and merge into the merits of the forthcoming final decision on sale procedures, so it is not collateral to the pending proceedings.

\*       \*       \*

28

We lack jurisdiction over the appeals, so we will dismiss them. In doing so, we express no opinion on the merits, as they are not before us. Venezuela or other appellants may raise their arguments in a future appeal from a final decision, and we will consider their arguments then.