# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PETRÓLEOS DE VENEZUELA, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0778-PAF |
| | ) | |
| PDV HOLDING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: November 21, 2023
Date Decided: November 28, 2023

Kenneth J. Nachbar, Susan W. Waesco, Alexandra Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Plaintiff Petróleos de Venezuela, S.A.*

Samuel T. Hirzel, II, Jamie L. Brown, Aaron M. Nelson, Gillian L. Andrews, Brendan Patrick McDonnell, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Joseph D. Pizzurro, Kevin A. Meehan, Juan O. Perla, Aubre G. Dean, Allesandra D. Tyler, CURTIS, MALLET-PREVOST, COLT & MOSLE LLP, New York, New York; *Attorneys for Defendant PDV Holding, Inc.*

Rebecca L. Butcher, Jennifer L. Cree, LANDIS RATH & COBB LLP, Wilmington, Delaware; Steven F. Molo, Justin M. Ellis, Joshua D. Bloom, Mark W. Kelley, Lois S. Ahn, MOLOLAMKEN LLP, New York, New York; *Attorneys for* Amicus Curiae *Red Tree Investments, LLC*.

Marie M. Degnan, ASHBY & GEDDES, Wilmington, Delaware; *Attorney for* Amici Curiae *ACL1 Investments Ltd., ACL2 Investments Ltd., & LDO (Cayman) XVIII Ltd.*

Craig Martin, DLA PIPER LLP (US), Wilmington, Delaware; James E. Berger, DLA PIPER LLP (US), New York, New York; *Attorneys for* Amicus Curiae *Rusoro Mining Limited*.

Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Jonathan M. Albano, Christopher L. Carter, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts; *Attorneys for* Amicus Curiae *OI European Group B.V.*

Laura Davis Jones, Peter J. Keane, PACHULSKI STANG ZIEHL & JONES LLP, Wilmington, Delaware; Alexander A. Yanos, Apoorva Patel, ALSTON & BIRD, LLP, New York, New York; Robert Poole, ALSTON & BIRD, LLP, Atlanta, Georgia; *Attorneys for* Amici Curiae *Northrop Grumman Ship Systems, Inc., Koch Minerals Sàrl & Koch Nitrogen International Sàrl.*

Kevin J. Mangan, Matthew P. Ward, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware; Matthew H. Kirtland, NORTON ROSE FULBRIGHT US LP, Washington, District of Columbia; Katherine G. Connolly, NORTON ROSE FULBRIGHT US LLP, San Francisco, California; *Attorneys for* Amicus Curiae *Gold Reserve Inc.*

**FIORAVANTI, Vice Chancellor**

This is an action to compel the issuance of a replacement stock certificate under 8 *Del. C.* § 168. It is part of a much larger multi-jurisdictional dispute between non-party Crystallex International Corporation ("Crystallex") and the Bolivarian Republic of Venezuela ("Venezuela"). In the main dispute, Crystallex seeks to collect on a more than $1.2 billion arbitration award by executing on the U.S.-based assets of Venezuela's state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA"). The main dispute (the "Crystallex Action") currently resides in the United States District Court for the District of Delaware (the "Delaware District Court"), where the court has ordered a sale of the stock of PDV Holding, Inc. ("PDVH"), a Delaware corporation. The federal court has appointed a special master to commence a sale process.

PDVSA is the registered owner of all 1,000 shares of PDVH's stock. PDVSA has a photocopy of its PDVH stock certificate, but it has not presented the original certificate to the Delaware District Court. In response to a July 17, 2023 order of the Delaware District Court in the Crystallex Action, PDVSA filed this action against PDVH to compel the issuance of a replacement stock certificate representing all 1,000 shares of PDVH that PDVSA owns.

Under Section 168 of the Delaware General Corporation Law (the "DGCL"), the court may require a Delaware corporation to issue a new stock certificate if the owner is able to satisfy the court that the original certificate was lost, stolen, or

destroyed. Both parties agree that PDVSA is the registered owner of these shares. PDVSA alleges, and PDVH does not dispute, that the original stock certificate representing these shares has been lost, stolen, or destroyed. PDVH requests that PDVSA post a substantial bond to protect against liability for issuing a new stock certificate, arguing that there is a non-zero chance that the original certificate may have been transferred or pledged and may subject PDVH to liability under Section 8-405 of the Uniform Commercial Code.

Section 168 expressly provides that the court's order requiring issuance of a new certificate "shall direct that, prior to the issuance and delivery to the plaintiff of such new . . . certificate, the plaintiff give the corporation a bond in such form and with such security as to the court appears sufficient to indemnify the corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate . . . ." No corporation issuing a certificate pursuant to a court order under Section 168 "shall be liable in an amount in excess of the amount specified in such bond."

PDVH acknowledges that this court has discretion in setting the amount and form of the bond. For the reasons explained below, the court orders PDVH to issue a replacement stock certificate, conditioned upon PDVSA posting an unsecured bond in the amount of $10,000.

## I.    BACKGROUND[1]

### A.    Parties

PDVSA is a Venezuelan entity formed in 1975 by the President of Venezuela.[2]  The Venezuelan government is the sole owner of PDVSA, which is described as "one of the largest oil companies in the world."[3]

PDVH is a Delaware corporation with its principal place of business in Houston, Texas.[4]  PDVH owns CITGO Holding, Inc. ("CITGO Holding"), which in turn wholly owns CITGO Petroleum Corporation ("CITGO Petroleum"), one of the largest operating petroleum refiners in the United States.[5]  CITGO Holding and CITGO Petroleum are Delaware corporations.  PDVSA is the registered owner of all 1,000 shares of PDVH's stock.  These shares were initially issued on December 1, 2000.[6]

---

[1] After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr."  No disrespect is intended.

[2] *See Jiménez v. Palacios*, 250 A.3d 814, 822 (Del. Ch. 2019), *aff'd*, 237 A.3d 68 (Del. 2020) (TABLE); *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 404 (2018), *aff'd and remanded*, 932 F.3d 126 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2762 (2020) (mem.).

[3] *Crystallex*, 333 F. Supp. 3d at 404; *see* Compl. ¶ 1; Ans. ¶ 1.

[4] Compl. ¶ 2.

[5] Aff. of Fernando J. Vera ("Vera Aff.") ¶¶ 2–3.

[6] Compl. ¶¶ 5–6; *id.* at Ex. A.

## B.     The Crystallex Action

In 2011, Crystallex, a Canadian corporation, initiated arbitration proceedings against Venezuela before the International Centre for Settlement of Investment Disputes ("ICSID") pursuant to a bilateral investment treaty between Canada and Venezuela.[7]  The arbitration panel ultimately found in Crystallex's favor, awarding Crystallex damages of $1.2 billion plus interest.[8]  Crystallex then filed suit in the United States District Court for the District of Columbia to confirm the arbitration award.[9]  The court confirmed the award,[10] and after a reasonable period elapsed in which Venezuela still had not paid its debt, the court permitted Crystallex to commence proceedings in aid of the execution of the judgment.[11]

On June 19, 2017, Crystallex registered its judgment in the United States District Court for the District of Delaware.[12]  On August 14, 2017, Crystallex filed a motion seeking a writ of attachment as to the shares of PDVH, arguing that

---

[7] *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 133 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2762 (2020) (mem.).

[8] *Id.*

[9] *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:16-00661-RC (D.D.C.), Dkt. 1.

[10] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100 (D.D.C. 2017), *aff'd*, 760 F. App'x 1 (D.C. Cir. 2019).

[11] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2017 WL 6349729 (D.D.C. June 9, 2017).

[12] *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 1.

PDVSA, which owns PDVH, was the alter ego of Venezuela.[13]  Venezuela did not appear in the action at that time, but PDVSA intervened and moved to dismiss for lack of subject matter jurisdiction.[14]  In a detailed opinion, the Delaware District Court determined that Crystallex had successfully rebutted the presumption that PDVSA was a separate sovereign instrumentality under the Federal Sovereign Immunities Act, 28 U.S.C. § 1601(c).  As a result, PDVSA's assets were subject to execution to satisfy the payment of Venezuela's debt.[15]  The United States Court of Appeals for the Third Circuit affirmed that decision.[16]  The Crystallex Action is one of several actions in the Delaware District Court brought by creditors to collect debts owed to them by Venezuela, each of which is currently pending in front of Judge Leonard P. Stark.[17]

In the midst of the Crystallex Action, the Venezuelan government became embroiled in turmoil.  Nicolás Maduro, who had served as President of Venezuela

---

[13] *Id.* at Dkt. 2.

[14] *Id.* at Dkt. 14.

[15] *Crystallex*, 333 F. Supp. 3d at 414.

[16] *Crystallex*, 932 F.3d at 151–52.

[17] *See, e.g.*, *Crystallex International Corp. v. PDV Holding, Inc.*, C.A. No. 1:15-cv-01082-LPS (D. Del.); *ConocoPhillips Petrozuata B.V. v. Petróleos de Venezuela, S.A.*, C.A. No. 1:16-cv-00904-LPS (D. Del.); *Crystallex International Corp. v. PDV Holding, Inc.*, C.A. No. 1:16-cv-01007-LPS (D. Del.); *Conocophillips Petrozuata B.V. v. Petróleos de Venezuela, S.A.*, C.A. No. 1:17-cv-00028-LPS (D. Del.); *OI European Group B.V. v. Bolivarian Republic of Venezuela*, C.A. No. 19-cv-00290-LPS (D. Del.).  Judge Stark has continued to preside over these cases after being elevated to the United States Court of Appeals for the Federal Circuit in 2022.

since 2013, encountered a threat to his control over the Venezuelan government.[18] In 2018, Venezuela held a presidential election. Maduro disqualified opposition parties from participating in the 2018 election and claimed to win re-election.[19] Maduro was sworn in for a second term in January 2019.[20] On January 23, 2019, the Venezuelan National Assembly declared Maduro's presidency illegitimate and named opposition leader Juan Guaidó as Interim President of the Venezuelan government.[21] That same month, the United States recognized Guaidó as the rightful leader of Venezuela.[22]

Shortly after recognizing Guaidó as the leader of Venezuela, the United States took steps to convince the Maduro regime to cede power. One measure was the imposition of new sanctions set down in Executive Orders[23] and implemented by the Office of Foreign Assets Control ("OFAC").[24] On January 28, 2019, OFAC added PDVSA to its Specially Designated Nationals and Blocked Persons List, prohibiting U.S. persons "from engaging in transactions or dealings with PDVSA" without a

---

[18] *Jiménez*, 250 A.3d at 821.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Crystallex*, 932 F.3d at 135.

[23] *See* Exec. Order No. 13,692 (Mar. 8, 2015); Exec. Order 13,835 (May 21, 2018); Exec. Order 13,850 (Nov. 1, 2018); Exec. Order 13,884 (Aug. 5, 2019).

[24] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 247 (3d Cir. 2022) (quoting 31 C.F.R. § 591.407).

license from OFAC.[25] OFAC concurrently granted a general license authorizing certain activities to continue with PDVH and the CITGO entities.[26]

After becoming Interim President of Venezuela, Guaidó, under newly granted statutory authority, appointed an ad hoc Managing Board of PDVSA, which in turn reconstituted the boards of directors of its Delaware subsidiaries: PDVH, CITGO Holding, and CITGO Petroleum.[27] Those events led to litigation in this court under Section 225 of the DGCL over the rightful composition of the boards of the three Venezuelan-controlled Delaware entities. In an opinion addressing cross-motions for judgment on the pleadings, Chancellor McCormick, then a Vice Chancellor, determined that the ad hoc Managing Board of PDVSA appointed by the Guaidó government constituted the legitimate board in the view of the United States and, therefore, our nation's courts.[28] Thereafter, the court entered a final order holding

---

[25] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A.* (Jan. 28, 2019) ("Today's designation of PdVSA will help prevent further diverting of Venezuela's assets by Maduro and preserve these assets for the people of Venezuela."), *available at* https://home.treasury.gov/news/press-releases/sm594.

[26] *See* Press Release, U.S. Dep't of Treasury, *Issuance of a New Venezuela-related Executive Order and General Licenses; Venezuela-related Designation* (Jan. 28, 2019), *available at* https://ofac.treasury.gov/recent-actions/20190128. That general license, as subsequently amended, is General License 7C. General License, U.S. Dep't of Treasury, *Authorizing Certain Activities Involving PDV Holding, Inc. and CITGO Holding, Inc.* (Aug. 5, 2019), *available at* https://ofac.treasury.gov/media/34136/download?inline.

[27] *Jiménez*, 250 A.3d at 825.

[28] *Id.* at 820. Venezuela was permitted to intervene in the action as *amicus curiae*. *See id.* at 826.

that the Guaidó-appointed directors had been lawfully appointed and that their predecessors had been lawfully removed.[29]

The Crystallex Action has continued to roll on for several years, with numerous interlocutory orders by the Delaware District Court and appeals to the United States Court of Appeals for the Third Circuit.[30]  Of note for present purposes, on January 14, 2021, the Delaware District Court granted Crystallex's motion to set sales procedures for the public sale of PDVSA's shares of PDVH stock.[31]  In doing so, the court recognized that under then-existing law and policy, "a sale of PDVH shares cannot be completed without a specific OFAC license."[32]  On April 13, 2021,

---

[29] *Jiménez v. Palacios*, 2019 WL 3974923 (Del. Ch. Aug. 21, 2019), *aff'd*, 237 A.3d 68 (Del. 2020) (TABLE).

[30] *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019) (affirming denial of PDVSA's motion to dismiss for lack of subject matter jurisdiction), *cert. denied*, 140 S. Ct. 2762 (2020) (mem.); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803 (D. Del. Jan. 14, 2021), *appeals dismissed*, 24 F.4th 242 (3d Cir. 2022) (dismissing appeals from Delaware District Court decisions that PDVH's stock is not immune from attachment under the Foreign Sovereign Immunities Act and from denial of motion to quash writ of attachment); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2022 WL 611586 (D. Del. Mar. 2, 2022), *appeal dismissed*, No. 22-1606 (3d Cir. Aug. 3, 2022), ECF No. 4 (dismissing appeal from rejection of objections to proposed sales procedures order for lack of appellate jurisdiction); *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 508 (noticing appeal by Red Tree Investments, LLC of the court's denial of its motion to intervene).

[31] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803 (D. Del. Jan. 14, 2021), *appeal dismissed*, 24 F.4th 242 (3d Cir. 2022).

[32] *Id.* at *16.  During the pendency of an appeal of that ruling, OFAC denied Crystallex's license application.  *See Crystallex*, 24 F.4th at 248 n.3.

the Delaware District Court appointed a special master to devise a plan for the sale of PDVSA's shares of PDVH stock.[33]

On October 4, 2022, the Delaware District Court entered an order requiring Venezuela, PDVSA, PDVH, and CITGO Petroleum (collectively the "Venezuelan Parties") to inform the special master "as to the specific and precise location of the PDVH Shares held by PDVSA or any other facts relevant for determining the physical location of the PDVH Shares held by PDVSA and the custodian of the shares."[34] The order further stated that if the PDVH shares cannot be located with reasonable precision, the special master was to make a recommendation regarding appropriate steps to ensure that a successful bidder is able to actually purchase the applicable PDVH shares in connection with the sale transaction.[35]

In April 2023, OFAC indicated that it intended "to implement a favorable licensing policy for license agreements in connection with the execution of a sale as contemplated in the Sales Order or, as applicable, the negotiation of a settlement agreement among the relevant parties."[36] On July 17, 2023, after considering submissions from numerous creditors of Venezuela or PDVSA, the Venezuelan

---

[33] *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkts. 234, 235.

[34] Def.'s Opening Br. Ex. A ¶ 48.

[35] *Id.* ¶ 49.

[36] *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 553 at Ex. 1.

Parties, and the special master, the Delaware District Court entered an order directing that the sale proceed over the objections of PDVH and PDVSA.[37]

In another ruling on July 17, 2023, the Delaware District Court ordered PDVSA to deposit a share certificate demonstrating its ownership of PDVH with the special master.[38] If PDVSA was unable to deliver the stock certificate, the order required PDVSA to file a letter with the court indicating whether it would request that the Delaware District Court issue a replacement share certificate or, instead, file an action in the Delaware Court of Chancery to seek a replacement share certificate on an expedited basis.[39]

On July 26, 2023, PDVSA requested that PDVH issue a replacement stock certificate.[40] PDVH responded two days later, stating that PDVH "would be happy to comply" with the request "so long as PDVSA files with PDVH a bond, in an amount set by a court, 'sufficient to indemnify [PDVH] against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate [ . . . ] or uncertificated shares.'"[41]

---

[37] *Id.* at Dkt. 643.

[38] *Id.* at Dkt. 644.

[39] *Id.*

[40] Compl. ¶ 17; Ans. ¶ 17.

[41] Def.'s Opening Br. Ex. C (quoting 8 *Del. C.* § 167).

PDVH did not specify an amount of the bond that it deemed sufficient to indemnify PDVH against any potential claim.

## C.    Procedural History

On July 31, 2023, PDVSA filed a verified complaint (the "Complaint") in this action, seeking the issuance of a new stock certificate pursuant to 8 *Del. C.* § 168.[42] The Complaint alleges that PDVSA does not have access to its former premises in Caracas, Venezuela, as those premises are believed to be occupied by the Maduro regime.[43]  Therefore, according to PDVSA, it does not have physical possession of its PDVH stock certificate, which may have been lost or destroyed.[44]

Concurrent with the filing of its Complaint, PDVSA moved for expedited proceedings, which PDVH did not oppose.[45]  On August 24, 2023, the court entered an order requiring PDVH to show cause why it should not issue a new stock certificate in place of the one described in the Complaint.[46]

On September 19, 2023, Red Tree Investments, LLC, Rusoro Mining Limited, ACL1 Investments Ltd., ACL2 Investments Ltd., LDO (Cayman) XVIII Ltd., OI European Group B.V., Northrop Grumman Ship Systems, Inc., f/k/a Ingalls

---

[42] Dkt. 1.

[43] Compl. ¶ 12.

[44] *Id.* ¶ 13.

[45] Dkts. 1, 5.

[46] Dkt. 9.

11

Shipbuilding, Inc., and now known as Huntington Ingalls Incorporated, Koch Minerals Sàrl, Koch Nitrogen International Sàrl, and Gold Reserve Inc., each creditors of PDVSA or Venezuela, filed a motion for leave to file an *amici curiae* brief in this action.[47] The court granted that motion, and on September 21, 2023, the *amici curiae* filed a brief in support of reissuing the PDVH stock certificate.[48]

The court held a hearing on September 22, 2023.[49] On October 23, 2023, the court ordered the parties to devise a form of notice sufficient to inform any person claiming an interest in the shares or stock certificate of this pending proceeding and inviting them to submit their claims to this court.[50] The parties fashioned a form of notice providing for publication in the international edition of the *Wall Street Journal*, the *Financial Times*, and on certain internet portals accessible by citizens of Venezuela; for mailing to attorneys known to represent the Maduro regime and to PDVSA's office in Venezuela; and for issuance of a press release by PDVH attaching the notice.[51] On November 14, 2023, the plaintiff submitted affidavits attesting to the form and manner of notice provided.[52] The notice was published as

---

[47] Dkt. 25.

[48] Dkt. 37.

[49] Dkt. 49.

[50] Dkts. 51–52.

[51] Dkt. 56.

[52] Dkts. 60–62 (affidavits of Kenneth J. Nachbar, Esquire; Elisa Totaro; Kate Robbins).

a half-page advertisement in the *Wall Street Journal* on October 31, 2023 and in the *Financial Times* on November 1, 2023.[53]  The notice was also published in English and Spanish on PDVH's website on October 30.[54]  Notice was provided in Spanish on six news websites accessible by Venezuelan citizens:  Alberto News, VPltv, EVTV Miami, La Patilla, Dólar Today, and El Nacional.[55]  The parties also delivered targeted notice via mail to four known attorneys to the Maduro regime and to PDVSA's offices in Venezuela, which PDVSA believes to be occupied by members of the Maduro regime.[56]

On November 21, 2023, the court held a hearing to consider any third-party claim to an interest in the PDVH shares or the stock certificate.[57]  No claims were filed with the court, and no individual or entity appeared at the hearing claiming any interest in the stock or the stock certificate.

---

[53] Robbins Aff. Exs. A–B.

[54] *Id.* at Ex. C.

[55] Totaro Aff. Ex. C.  The notice was also published via the social media platform of three users of X (formerly Twitter).  *Id.*

[56] Nachbar Aff. Exs. A–C.

[57] Dkt. 66.

## II.    ANALYSIS

To obtain a new stock certificate in this action, PDVSA must satisfy its statutory burden under Section 168 of the DGCL. Thus, the court's analysis begins with the statute itself.

### A.    Section 168

Section 168 allows a stockholder to petition the Court of Chancery to compel the replacement of lost, stolen, or destroyed stock certificates. It provides, in pertinent part:

> If, upon hearing, the court is satisfied that the plaintiff is the lawful owner of the number of shares of capital stock, or any part thereof, described in the complaint, and that the certificate therefor has been lost, stolen or destroyed, and no sufficient cause has been shown why . . . a new certificate should not be issued in place thereof, it shall make an order requiring the corporation to issue and deliver to the plaintiff new uncertificated shares or a new certificate for such shares. In its order the court shall direct that, prior to the issuance and delivery to the plaintiff of . . . a new certificate, the plaintiff give the corporation a bond in such form and with such security as to the court appears sufficient to indemnify the corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new uncertificated shares or new certificate. No corporation which has issued . . . a certificate pursuant to an order of the court entered hereunder shall be liable in an amount in excess of the amount specified in such bond.

8 *Del. C.* § 168(b).

A plaintiff seeking an order compelling issuance of a replacement stock certificate must satisfy three requirements under Section 168. First, the corporation must have refused to issue a new stock certificate. 8 *Del. C.* § 168(a); *see Mastellone*

14

*v. Argo Oil Corp.*, 82 A.2d 379, 382 (Del. 1951) ("[Sections 167 and 168] provide first for application to management for the issuance of replacement certificates, and failing favorable action by management, for resort to the courts on petition for a rule to show cause why new certificates should not be issued."). Second, the plaintiff in a Section 168 action must prove that it is the lawful owner of the capital stock described in the complaint and that the stock certificate has in fact been lost, stolen, or destroyed. 8 *Del. C.* § 168(b); *Matter of N. European Oil Corp.*, 1984 WL 136934, at *5 (Del. Ch. Mar. 30, 1984) ("[T]his Court imposes the burden of reasonable certainty that the certificates were in fact owned by the petitioner before it will issue an order compelling replacement"); *Merrill Lynch Pierce Fenner & Smith, Inc. v. N. European Oil Royalty Tr.*, 490 A.2d 558, 563 (Del. 1985) ("As the party seeking relief from the court, the burden is on the petitioner under the Statute to establish with reasonable certainty that the certificates were owned by him and that they had become lost or destroyed."); *accord Germaninvestments AG v. Allomet Corp.*, 225 A.3d 316, 342 (Del. 2020). If the court concludes that the first two requirements are satisfied and that the corporation has not demonstrated good cause not to issue the new certificate or new uncertificated shares, the court "shall make an order requiring the corporation to issue and deliver to the plaintiff . . . a new certificate for such shares." 8 *Del. C.* § 168(b). That order must direct that "the plaintiff give the corporation a bond in such form and with such security as to the

15

court appears sufficient to indemnify the corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such . . . new certificate." *Id.* That bond provides the upper limit of the corporation's liability for actions arising out of the issuance of a duplicate share certificate. *Id.*; *see Castro v. ITT Corp.*, 598 A.2d 674, 682 (Del. Ch. 1991); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 5.21 (4th ed. Supp. 2021-2) ("The fixing and posting of the bond establishes the limit of the corporation's liability, and aggrieved parties may not receive separately or in the aggregate any more than the amount specified in the bond."); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 18.04, at 18-7 (2022) (hereinafter "Drexler") ("Where the Court of Chancery exercises this power and compels the issuance of a new certificate, it must require the stockholder to post an indemnity bond.").

There is no dispute that PDVSA is the registered owner of all 1,000 outstanding shares of PDVH stock. PDVSA contends that, due to the political struggle between the Maduro regime and the interim government of Venezuela, PDVSA lacks access to its former premises in Caracas, Venezuela, which are believed to be occupied by persons affiliated with the Maduro regime.[58] Thus,

---

[58] Compl. ¶ 12.

16

according to the Complaint, "[i]t is unknown to PDVSA if [the original stock certificate] is in the possession of the Maduro regime or if it has been lost or destroyed."[59] On July 21, 2023, "PDVSA notified the [Delaware District] Court that the share certificate is lost, stolen or destroyed."[60]

PDVH claims not to know whether the stock certificate is "in the possession of the Maduro regime or some other person or entity, has been transferred or pledged, or has been lost or destroyed."[61] In its opening brief, PDVH took no position on whether the stock certificate has been lost, stolen, or destroyed.[62] Nevertheless, PDVH does not object to the issuance of a replacement certificate, except that it requests that this court impose a substantial bond. PDVH's position as to the amount of a bond has shifted throughout these proceedings, after first suggesting a bond between $32 billion and $40 billion.[63] In a letter to the court last week, PDVH indicated that a bond of $1 billion to $2 billion should be required.[64]

---

[59] *Id.* ¶ 13.

[60] *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 646 at 2.

[61] Ans. ¶ 13.

[62] Def.'s Opening Br. 9.

[63] *Id.* at 14.

[64] Dkt. 64.

PDVSA contends that it is ill-positioned to post a large bond due to its financial status and the restrictions imposed by the OFAC sanctions.[65] PDVSA's responsive brief in this action was slightly over five pages in length. Just one page of PDVSA's brief was devoted to the central issue: the amount of any bond. In that regard, the brief was essentially non-responsive, only to say that PDVH's suggestion of a $32 billion to $40 billion bond was "excessively high."[66] PDVSA's lack of assistance to the court is not entirely surprising considering that this case was brought pursuant to the Delaware District Court's order requiring the reissuance of the stock certificate to effectuate a sale of the assets of PDVH and PDVSA's shared ultimate parent, Venezuela. As noted by the Third Circuit, "PDVSA is Venezuela for purposes of" the Crystallex Action, with an incentive to protect against a sale of PDVH, "Venezuela's largest and most important foreign asset." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 247–48 (3d Cir. 2022). Together and individually, PDVSA, PDVH, and Venezuela have intervened or defended several proceedings against them, managing to slow down the sales process in repeated acts of recalcitrance despite a "repeatedly-victorious judgment creditor." *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 234 at 37 ("Each day that Crystallex does

---

[65] Pl.'s Answering Br. 3–6.

[66] *Id.* at 5.

not recover on its judgment is arguably something of an affront to the United States judicial system. Those days must soon come to an end.").

The *amici curiae* recognize the parties' aligned interests and argue that, at most, the court should require a nominal bond given the extremely low likelihood that any pledge or sale of the stock has been made to anyone who could assert a legitimate claim that could result in liability to PDVH.[67] The *amici* point out that PDVH and PDVSA have worked together to delay the Crystallex Action at every turn, including by arguing that a writ of attachment cannot be levied upon their stock without physical possession of the original share certificate.[68] They further argue that, as Delaware law limits the company's liability to the amount of the bond, setting a nominal bond will do no harm to PDVH.[69]

---

[67] Amici Br. 6–10.

[68] *Id.* at 3–4.

[69] *Id.* at 5–6. On September 19, 2023, Crystallex filed an unsolicited letter with the court requesting dismissal of this action for lack of jurisdiction due to the alleged lack of adversity between PDVSA and PDVH. Dkt. 22. Crystallex did not move to intervene and unlike the *amici curiae*, did not seek leave to file a substantive letter or brief. A dispute over the amount of the bond is a quintessential dispute under Section 168. *See* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.03[a], at 9-60 (2d ed. 2022) (hereinafter "Wolfe & Pittenger") ("Resort to litigation in the Court of Chancery thus is necessitated only if the issuing corporation refuses a request under Section 167 or Section 8-405 for the issuance of a replacement stock certificate, or if the owner deems the bond or other requirements imposed by the corporation unreasonable."); *id.* at 9-64 ("[T]he bond requirement is the source for some of the most frequently controverted issues in suits concerning lost, stolen, or destroyed stock certificates.").

**B. The Original Stock Certificate Was Lost, Stolen, or Destroyed.**

PDVSA alleges, and PDVH does not dispute, that PDVSA lacks access its offices in Venezuela due to the ongoing political turmoil in that country. Thus, the court finds that PDVSA has satisfied its burden to show that the original stock certificate evidencing its ownership of all 1,000 shares of PDVH's outstanding stock has been lost, stolen, or destroyed within the meaning of Section 168. Therefore, the sole issue remaining before this court is the amount and form of a bond.

**C. The Court Must Set A Bond.**

Section 168 requires the court to set a bond in such form and with such security "as to the court appears sufficient." 8 *Del. C.* § 168(b). Delaware caselaw construing Section 168 directs that if the issuer demands a bond, "the courts lack the power to dispense with that requirement against the corporation's will." *Mastellone v. Argo Oil Corp.*, 82 A.3d 379, 383 (Del. 1951); *accord Cory v. Tampax Inc.*, 1976 WL 1707, at *5 (Del. Ch. Apr. 30, 1976) ("Whether or not such a lost instrument bond is to be required is within the discretion of corporate management and with this discretion the Court cannot interfere."); Drexler § 18.04, at 18-7.[70] The *amici curiae*

---

[70] The pertinent bond and security provisions of Section 168 in existence at the time of *Mastellone* are not materially different from the current version of the statute. Prior to the 1967 revision to the DGCL, the Superior Court had exclusive jurisdiction for any claim under Section 168. *See Ohrstrom v. Harris Tr. Co. of New York*, 1998 WL 13859, at *1 n.7 (Del. Ch. Jan. 9, 1998). In *Graham v. Commercial Credit Co.*, 194 A.2d 863 (Del. Ch. 1963), a stockholder of a Delaware corporation filed an action in this court seeking to

20

argue that the court can dispense with the bond requirement, citing cases where the court entered stipulated orders requiring reissuance of a stock certificate without a bond. *In re Issuance of Replacement Certificates of Shares of Panera Bread Company Class B Common Stock*, C.A. No. 5372-CC (Del. Ch. Oct. 7, 2010) (ORDER); *In re Issuance of a Replacement Certificate of Shares of STR Holdings, Inc. Common Stock*, C.A. No. 11607-VCP (Del. Ch. Oct. 27, 2015) (ORDER). Those cases do not support dispensing with the bond requirement here. Section 168 and the cases applying it require the imposition of a bond if the issuer insists upon one. *Panera Bread* and *STR Holdings* involved circumstances where the issuer did not insist upon a bond and the court did not opine upon its necessity.

---

compel issuance of stock certificates to which the stockholder became entitled after a stock split. The corporation's bylaws required that in the case of a lost stock certificate, another certificate may be issued upon "the giving of a bond of indemnity." *Id*. at 864. The stock certificates at issue had been sent by registered mail to the plaintiff's residence and were signed for by a domestic employee. The plaintiff, seeking to avoid application of the bylaw, argued that the employee lacked legal authority to sign for the delivery and, therefore, the shares were never delivered in the first instance. The court disagreed and, relying on *Mastellone*, concluded it was not the court's province to dispense with the bond requirement. *Id*. at 866. On appeal, the Delaware Supreme Court affirmed. *Graham v. Comm. Credit Co.*, 200 A.2d 828 (Del. 1964). In doing so, however, the Court observed that the plaintiff "made an appealing argument" that under the circumstances it would be "unfair to compel him to deliver a corporate security bond to indemnify the [company]." *Id*. at 831. But the Delaware Supreme Court noted that plaintiff's argument had been brought in the wrong court, because his action was not one for the issuance of replacement stock certificates under Section 168 (which at that time could only be brought in the Superior Court), but to compel the issuance of certificates "on the theory that they had never been issued" in the first instance. *Id*. Thus, plaintiff's "argument as to the fairness of the requirement of a bond has no bearing upon the question of the first issues of certificates. If it is relevant at all, it would be an action under 8 *Del. C.* § 168, and not in an action under 8 *Del. C.* § 158, which this is." *Id*.

21

The court reads the statute and the caselaw as prohibiting the court from waiving the bond and security requirement, but allowing the court to exercise its discretion in determining the form and sufficiency of the bond based upon the circumstances presented in each case. PDVH agrees: "The Court of course has discretion to set the amount of the bond, but in exercising that discretion, it is compelled to require a bond that is sufficient [i]n amount to protect the issuer if the original stock certificate is presented."[71]

PDVH argues that a significant bond is required due to perceived "ambiguities in Delaware law."[72] Specifically, PDVH points to a seeming tension between Section 168 of the DGCL, which limits an issuer's liability to the maximum amount

---

[71] Def.'s Opening Br. 14–15; *see also* Dkt. 49, Tr. at 13:9–12 (PDVH's counsel: "Now, the Court has discretion as to the amount of the bond, but I don't believe that the statute provides discretion as to the fact of the bond."); *id*. at 13:13–17 (The Court: "Would you agree with me that I have discretion to determine whether the bond is secured or unsecured? [PDVH's counsel]: I think Your Honor probably has that discretion, yes."). Such discretion is inherent in the setting of a bond. *See New Orleans Ins. Co. v. E.D. Albro Co.*, 112 U.S. 506, 507 (1884) (affirming the lower court's decision to require a bond it described as "unusual in form" as "within the legal discretion of a . . . judge"); *In re Weaver Hldg. Co.*, 2011 WL 5910707, at *2 (Del. Ch. Nov. 28, 2011) (noting that statutory language in the voluntary assignment statute (10 *Del. C.* § 7383(a)) requiring "sufficient surety" left the form of bond within the discretion of the trial judge).

[72] Def.'s Opening Br. 10.

of the bond, and Section 8-405 of the Uniform Commercial Code (the "UCC"). *See*

6 *Del. C.* § 8-405.[73]

Section 8-405 provides a remedy for owners of certificated securities which have been lost, destroyed, or wrongfully taken, requiring the issuer to issue a new certificate if the request occurs before the issuer has notice that the certificate has been acquired by a protected purchaser, the owner files a "sufficient indemnity

---

[73] PDVH argues that in such a circumstance, "it is not clear which statute will control." Def.'s Opening Br. 11. If a person possessing the original certificate were to bring a claim to compel registration of a transfer under the Uniform Commercial Code, the claim would be governed by Delaware law, as the law of the issuer. U.C.C. § 8-110(a) (Unif. L. Comm'n 2023) (hereinafter "UCC"). Section 8-110, which clarifies any ambiguity over the governing law for the issuer's liability for wrongful registration, was promulgated after the court's decision in *Castro* with the intent to standardize the applicable law for disputes over the issuer's duty to register a transfer. *See* Sandra M. Rocks & Penelope L. Christopherorou, *Memorandum Regarding the 1994 Uniform Version of Article 8 of the Uniform Commercial Code and the Federal Book-Entry Regulations (With Addendum Regarding Investment Property Changes Under Revised Article 9)*, SD76 ALI-ABA 185, 187–88 (1999) ("[T]he 1978 amendments had retained outdated choice of law rules, based in large part on where a physical security certificate was located, which often chose a jurisdiction that most market participants considered irrelevant. The Revised UCC provides choice-of-law rules in both the sale and security interest contexts that are keyed to the way in which the interest in the security is maintained."). Faced with a judgment in this court issuing a new stock certificate under Section 168 and a request for relief which exceeds the bond amount, the court would need to resolve the apparent conflict between DGCL Section 168(b), limiting the issuer's liability to the bond, and UCC Section 8-405, providing for liability in the amount for which the stock certificate was conveyed. Delaware law is clear on this issue. The provisions of Article 8 in the DGCL, including Section 168, control to the extent that they are inconsistent with the UCC. *See* 8 *Del. C.* § 201 ("Except as otherwise provided in this chapter, the transfer of stock and the certificates of stock which represent the stock or uncertificated stock shall be governed by Article 8 [of the UCC. To the extent that any provision of [the DGCL] is inconsistent with any provision of Article 8 of [the UCC], [the DGCL] shall be controlling.").

23

bond" with the issuer, and the owner "satisfies other reasonable requirements imposed by the issuer." 6 *Del. C.* § 8-405(a). The code provides that if, after the new certificate is issued, a protected purchaser of the original certificate presents it to the issuer for registration, the issuer must register the transfer unless it would cause the company to issue more shares than are authorized. *Id.* § 8-405(b). If an overissue would result, a protected purchaser may either compel the issuer to purchase the security, if an identical security is reasonably available, or if a security is not reasonably available for purchase, "may recover from the issuer the price the person or the last purchaser for value paid for it with interest from the date of the person's demand." *Id.* § 8-210(c)–(d). The official comments to Section 8-405 provide:

> Where both the original and the new certificate have reached protected purchasers the issuer is required to honor both certificates unless an overissue would result and the security is not reasonably available for purchase. . . . In the latter case alone, the protected purchaser of the original certificate is relegated to an action for damages. In either case, the issuer itself may recover on the indemnity bond.

6 *Del. C.* § 8-405 cmt. 2; *see also* 4 James D. Cox & Thomas Lee Hazen, Treatise on the Law of Corporations § 28:9 (3d ed. 2022) (hereinafter "Cox & Hazen") ("If the old and the new certificates were transferred to protected purchasers, the issuer would, subject to there being no over issuance problem, be required to recognize both purchasers; hence, the importance of the indemnity bond."). Courts have acknowledged that under Section 8-405, an issuer's liability may exceed the amount

24

of the indemnity bond. *See, e.g.*, *Glaser v. Texon Energy Corp.*, 702 F.2d 569, 572 (5th Cir. 1983). This appears to conflict with DGCL Section 168, which provides that for stock certificates reissued thereunder, the issuer's liability is limited to the amount of the bond. 8 *Del. C.* § 168(b).

Chancellor Allen addressed this apparent tension in the law in *Castro v. ITT Corp.*, 598 A.2d 674 (Del. Ch. 1991). In that case, partners in a Cuban partnership that held certificated shares of a Delaware entity, ITT Corp., petitioned this court for the issuance of new stock certificates in ITT after the Cuban government seized control of the partnership. *Id.* at 675. Despite the imposition of U.S. sanctions against Cuba, the partners obtained licenses from OFAC entitling them to a distribution from ITT of the stock held of record by the Cuban partnership. *Id.* at 676. The court noted the inconsistency between the UCC and Section 168, as the UCC was intended "to promote the negotiability of share certificates" by "merg[ing] the legal interest of stock into what might be thought of as the only evidence of that interest, the certificate." *Id.* at 681. This differs from the Delawarean view, under which stock certificates are "merely evidence of the underlying property right." 1 Wolfe & Pittenger § 9.03[a], at 9-58.2.

To illustrate the potential disconnect between Section 168 and Section 8-405, the court in *Castro* engaged in an extended hypothetical. The Chancellor started with the assumption that this court ordered issuance of a new certificate and set a

25

bond that it believed to be sufficient. Then suppose a protected purchaser of the

original certificate brings a claim in Florida against the issuer under Florida's version

of Sections 8-401 and 8-405 of the UCC.[74] Assume further that the potential

damages in the Florida proceeding would exceed the amount of the bond. Would

the Florida court give this decision full faith and credit and accept the issuer's

defense that any damages cannot exceed the amount of the bond set by this court

under Section 168?[75]

There was no definitive answer to the hypothetical, but the Chancellor offered

the following as a potential outcome:

> So far as I apprehend, the only way in which the Florida court might be
> considered bound to respect such a plea would be upon the conclusions
> that the action in Delaware was an action *in rem* (the underlying shares
> being the property in question) and that the hypothetical Florida
> petitioner was bound by the judicial determination of "lawful
> ownership" of the shares in that action. This might plausibly be
> concluded, but in no event could it be done if there had been no notice

---

[74] The hypothetical assumes there is personal jurisdiction over the issuer in Florida.

[75] As noted, a claim seeking to compel the issuer to register a transfer of the stock of a Delaware corporation under the Uniform Commercial Code would be governed by Delaware law. *See* UCC § 8-110(a) ("The local law of the issuer's jurisdiction . . . governs: . . . (2) the rights and duties of the issuer with respect to registration of transfer; (3) the effectiveness of registration of transfer by the issuer; (4) whether the issuer owes any duties to an adverse claimant to a security . . . ."); *see also Plesko v. Figgie Int'l*, 528 N.W.2d 446, 451 n.3 (Wis. Ct. App. 1994) ("Article 8 has essentially been adopted in the same form in both Wisconsin and Delaware, the state of Figgie's incorporation. . . . The law of Delaware governs Figgie's responsibilities regarding transfer registration."); *Bradford Tr. Co. of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F. Supp. 208, 210 (S.D.N.Y. 1985) ("The validity of a security, the effectiveness of registration by the issuer, and the rights and duties of the issuer with respect to registration or transfer are governed by the law (including the conflict of law rules) of the jurisdiction of the issuer.").

to the world of the scope of the Delaware action and an opportunity to appear in it.

*Castro*, 598 A.2d at 683.

Chancellor Allen's hypothetical was not "wholly imaginary," at least not at the time of the opinion. *Id*. at 682 n.10. During the pendency of the proceedings in *Castro*, ITT received correspondence from a Florida resident who claimed to be acting for heirs of other partners of the partnership and possessed ITT stock certificates registered in the name of the partnership. *Id*. To that end, Chancellor Allen determined that the appropriate approach was to devise a mechanism to provide notice to third persons claiming any ownership rights in the original shares and affording them an opportunity to be heard. *Id.* at 683. The Chancellor opined that if notice was reasonable under the circumstances, any person who did not appear but held a negotiable stock certificate would be bound by this court's decision. *Id.*[76]

In the present case, no person appeared following the initial filing of this action to claim an interest in the PDVH shares or the stock certificate. Nevertheless, the court has followed Chancellor Allen's lead and required notice of these proceedings to any person claiming an interest in the PDVH shares or the stock certificate. Notice of these proceedings has been disseminated and no person has

---

[76] The court in *Castro* did not subsequently adjudicate any claim to the ITT shares, and ultimately, the court was not required to set a bond. Thus, *Castro* does not offer guidance on the court's exercise of discretion in setting the amount of a bond following notice to potential claimants.

come forward with a claim to the shares or the certificate. Notice as provided is reasonable under the circumstances.[77] Whether some other court will afford full faith and credit to this decision in the event someone comes forward later claiming a right to the PDVH stock is unknowable. "This court cannot authoritatively determine whether *res judicata* will in fact be granted, or full faith and credit accorded to its judgment. That matter will always present an issue for the later tribunal." *Castro*, 598 A.2d at 683 n.14. That potentiality exists regardless of whether the court were to set the bond amount in this case at $1.00 or $1 billion. Still, that no person has come forward to claim any interest in the shares or the stock certificate is, as discussed below, a factor to be considered in setting the bond.

### D. The Court Has Discretion in Determining the Amount of the Bond.

Section 168 requires a "bond in such form and with such security as to the court appears sufficient to indemnify the corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such . . . new certificate." 8 *Del. C.* § 168(b). As a general matter, in situations where bond is required, "the purpose of the bond is to

---

[77] *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 317 (1950) ("This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning. Thus it has been recognized that, in the case of persons missing or unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights." (citations omitted)).

protect a party whose property rights or judgment rights are being interfered with."
*Nutt (Earl R.) v. Gaf Corp.*, 1987 WL 9612, at *1 (Del. Super. Mar. 18, 1987).  In the specific context of the reissuance of a stock certificate, the party to be protected is the issuer. *Liberte Cap. Gp., LLC v. Capwill*, 2004 WL 7350415, at *3 (N.D. Ohio Dec. 8, 2004).  A bond "is necessary because the absence of a certificate constitutes notice to the corporation that a third party might have superior title to the underlying stock and that the corporation could be liable for conversion to one holding the original certificate in good faith under a superior title."  1 Wolfe & Pittenger § 9.03[a].  As one federal court commented in discussing the bond requirement under UCC § 8-405:  "The purpose of such a bond is to protect the interests of the issuer, not third-parties." *Beardmore v. Am. Summit Fin. Hldgs., LLC*, 2002 WL 523899, at *6 (D. Minn. Apr. 5, 2002) (citing 11 William Meade Fletcher et al., Fletcher Cyc. Corps. § 5180 (perm. ed. 1995)); *see also* Ronald A. Anderson, Uniform Commercial Code § 8-405:14 (3d ed. 1996) ("Difficult questions arise as to the meaning of a 'sufficient indemnity bond.'  No precise rule has been stated because of the different kinds of securities that may be involved, with the consequence that there is a variety of losses that might be sustained by the issuer.").

The parties agree that the setting of the amount of a bond under Section 168 is an exercise of the court's discretion.  "The essence of judicial discretion is the exercise of judgment directed by conscience and reason, as opposed to capricious or

29

arbitrary action." *Pitts v. White*, 109 A.2d 786, 788 (Del. 1954) (quoting *Radio Corp. of Am. v. Phila. Storage Battery Co.*, 6 A.2d 329, 342 (Del. 1939)); *see also Dover Hist. Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006) ("When an act of judicial discretion is under review, the reviewing court may not substitute its own notions of what is right for those of the trial judge, if his judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness." (quoting *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968)); *Firestone Tire & Rubber Co. v. Adams*, 541 A.2d 567, 570 (Del. 1988) ("[W]hen a court has not exceeded the bounds of reason in view of the circumstances and has not so ignored recognized rules of law or practice so as to produce injustice, its legal discretion has not been abused."). "[A]s is always the case when an issue is committed to judicial discretion, the judge's decision must be supported by a circumstance that has relevance to the issue at hand." *Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 196 n.8 (1995).

The exercise of judicial discretion in setting a bond often arises in the context of injunction proceedings. *See* Ct. Ch. R. 65(c) ("No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."); *Petty v. Penntech Papers, Inc.*, 1975 WL 7481, at *1 (Del. Ch. Sept.

30

24, 1975) (noting that the amount of an injunction bond rests in the discretion of the court, but "for a substantial bond to be required it should be supported either by facts of record or by some realistic as opposed to a yet-unproven legal theory from which damages could flow to the party enjoined."). Delaware courts routinely recognize that the amount of any bond is a matter of the court's discretion which should be "exercised in a manner consistent with the purpose of an injunction bond—to protect a party that is wrongfully enjoined." *Guzzetta v. Serv. Corp. of Westover Hills*, 7 A.3d 467, 471 (Del. 2010). Where the restrained party does not appear to face cognizable harm from the injunctive relief granted, the court has discretion to set a nominal bond. *See, e.g.*, *Levco Alt. Fund, Ltd. v. Reader's Digest Ass'n, Inc.*, 2002 WL 31835461, at *1 (Del. Ch. Aug. 14, 2002) (requiring nominal bond of $5,000 to enjoin recapitalization); *Solar Cells, Inc. v. True N. P'rs, LLC*, 2002 WL 749163, at *8 (Del. Ch. Apr. 25, 2002) (setting a bond of $2,500 when enjoining consummation of a merger); 2 Wolfe & Pittenger § 14.06, at 14-77 ("Because of the discretionary nature of the security requirement and the infinite variety of potential factual circumstances bearing on the amount of security that is appropriate in any given case, there is no general rule or mathematical formula for the typical amount of security (or range of amounts) that the Court will order. In many cases, the Court has ordered 'nominal' security of only a few thousand dollars."). Thus, it is within the court's discretion to interpret the limited facts before the court, to balance the

31

interests of the parties, and to craft a bond which is adequately connected to the injunction it insures. *See Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 392 (3d Cir. 2021) (citing *U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers*, 431 F.2d 1046, 1048 (3d Cir. 1970)).

### E.   The Court Must Consider All Circumstances of the Present Case in Exercising Its Discretion.

PDVSA and the *amici curiae* point to specific circumstances of this protracted and high-profile dispute as militating against setting a substantial bond, including the lack of a dispute over ownership, the presence of OFAC sanctions, and PDVSA's various judicial admissions that it has not pledged or transferred the shares. PDVH concedes that the risk of the shares having been transferred or pledged is low. Nevertheless, it insists that risk cannot conclusively be said to be zero and, therefore, argues that PDVH is entitled to a substantial bond.

Neither party is content to pin down the amount of any potential bond. PDVH originally suggested setting a bond in the range of $30–40 billion.[78] PDVH pivoted in its reply brief, citing PDVH's average enterprise value and pledges made by its subsidiary to suggest a bond somewhere between $1.5 and $7.25 billion.[79] PDVH once again changed its position on November 20, 2023, requesting a bond in an

---

[78] Def.'s Opening Br. 14.

[79] Def.'s Reply Br. 2.

amount between $1 and $2 billion.[80]  PDVSA is more difficult to pin down.  First, it contends that OFAC sanctions prevent it from posting any bond.[81]  That appears to no longer be an issue.[82]  Second, PDVSA merely claims that PDVH's requested bond is "excessively high," without offering any alternative amount.[83]  The *amici curiae* urge the court to order no bond or a nominal bond, arguing that there is little to no risk that the stock certificate has been conveyed to a protected purchaser.[84]

### 1. Lack of Any Ownership Dispute

Before delving into PDVH's hypothetical scenarios under which a transferee or pledgee might one day surface with a bona fide claim to the shares or the certificate, the court must start with the facts in the record.  First, PDVSA is the record owner of all 1,000 issued and outstanding shares of PDVH.  These are the only issued shares of PDVH, and they are evidenced by one stock certificate.  Both parties agree that PDVH is the registered owner of each of these shares.  Neither party identifies another individual with a claim to beneficial ownership of the stock.  In that respect, this case stands in stark contrast to other cases brought under Section

---

[80] Dkt. 64.

[81] Pl.'s Answering Br. 3–4.

[82] Def.'s Reply Br. 12.

[83] Pl.'s Answering Br. 5.  Indeed, during the September 22, 2023 hearing, PDVSA's counsel lamented that, having discussed the issue with his client, "they just really are not in a position to pay any bond."  Dkt. 49, Tr. 37:18–20.

[84] Amici Br. 3.

168. *See, e.g.*, *Castro*, 598 A.2d at 676–77 (discussing plaintiffs' lack of record ownership or direct beneficial ownership of disputed stock); *Ohrstrom v. Harris Tr. Co.*, 1998 WL 13859, at *1 (Del. Ch. Jan. 9, 1998) (noting dispute as to plaintiffs' ownership of stock); *Cory*, 1976 WL 1707, at *5 (lacking evidence on the beneficial ownership of disputed shares); *Keech v. Zenith Radio Corp.*, 276 A.2d 270, 272 (Del. Ch. 1971) (denying relief under Section 168 where beneficial ownership had not been established); *In re Metro. Royalty Corp.*, 62 A.2d 857, 858 (Del. Super. 1948) (declining to grant relief where ownership had not been established); *see also Matter of N. European Oil Corp.*, 1984 WL 136934, at *6–7 (denying motion for summary judgment under Section 8-405 due to lack of proof on beneficial ownership). *But see In re Francis*, 108 A. 31, 32 (Del. Super. 1919) (granting motion to compel issuance of new stock certificate upon posting of bond at twice purported value of stock without reference to Section 168).

Nor is this a case involving a typical retail stockholder of a publicly traded company seeking a replacement certificate. In that scenario, the issuer would have no reasonable basis to know whether the certificate had been lost, stolen, or destroyed—or, as PDVH speculates here—potentially pledged as collateral in secret for an unknown private debt incurred by an unnamed debtor.

The stock certificate at issue here represents all outstanding shares of one of the largest oil companies on the planet. It is, in PDVH's words, worth tens or

34

hundreds of billions of dollars.[85]  In this instance, an individual with a claim to the stock of PDVH cannot be equated with someone who dropped a Powerball lottery ticket into a drawer, silently safeguarding the remote hope that it would become valuable in the future.  Anyone possessing the certificate or having a claim to it would know of its significant present value.  First, the certificate evidences all of the stock of PDVH, meaning the stockholder would have absolute control over CITGO Petroleum and CITGO Holding.  Any claimant to the certificate would take reasonable measures to protect their interest and stay reasonably informed about the company and any dispute over its ownership.[86]  Second, except perhaps for Rip Van Winkle, any holder of the certificate or an interest therein would be aware of the recent turmoil within the Venezuelan government, which controls PDVSA, and the potential threat to a claim on the shares.  Not only has the political turmoil been widely publicized, but several creditors of Venezuela have brought attachment proceedings in federal court seeking a judicially ordered sale of the stock.  It would be unreasonable to infer that a pledgee or transferee would be ignorant of this

---

[85] Def.'s Opening Br. 14–15.

[86] *See, e.g.*, *Bocock v. Innovate Corp.*, 2022 WL 15800273, at *12 (Del. Ch. Oct. 28, 2022) (noting the lack of allegations as to reasonable steps taken to monitor one's investments).

ongoing dispute. That is particularly so in the modern age of the internet and smartphones, which provide round-the-clock access to worldwide information.[87]

Despite high publicity over the years-long disputes over the PDVH shares and the attachment proceedings, no individual or entity has claimed any interest in the shares or the stock certificate. Still, PDVH asks this court to set a bond to protect against a possibility that a protected purchaser has silently safeguarded an interest in the shares. That risk is merely theoretical under the circumstances here and does not warrant the imposition of a substantial bond.

### 2.    Potential of Sale or Pledge Under the UCC

The bond under Section 168 accounts for the risk that the stock certificate is in the hands of a protected purchaser who may then seek registration of the transfer under Article 8 of the UCC. "'Protected purchaser' means a purchaser of a certificated or uncertificated security, or of an interest therein, who: (1) gives value; (2) does not have notice of any adverse claim to the security; and (3) obtains control of the certificated or uncertificated security." 6 *Del. C.* § 8-303(a). "[I]f a purchaser obtains notice of an adverse claim before giving value or satisfying the requirements for control, the purchaser cannot be a protected purchaser." *Id.* cmt. 2.

---

[87] Any suggestion that someone possessing the stock certificate evidencing all outstanding shares of one of the world's largest oil companies would lack internet access and a smartphone—for more than six years while this public saga has played out—is not reasonable.

The requirements for control differ depending on the form of the security. For securities represented by bearer certificates, a purchaser obtains control by delivery. . . . For securities represented by certificates in registered form, the requirements for control are: (1) delivery as defined in Section 8-301(b), plus (2) either an effective indorsement or registration of transfer by the issuer. Thus, a person who takes through a forged indorsement does not qualify as a protected purchaser by virtue of the delivery alone. If, however, the purchaser presents the certificate to the issuer for registration of transfer, and the issuer registers transfer over the forged indorsement, the purchaser can qualify as a protected purchaser of the new certificate.

*Id.* cmt. 3. The UCC, like the Internal Revenue Code and other statutes, treat "bearer shares" and "registered shares" differently. "Bearer shares are owned by the 'physical bearer of the stock certificate' and traditionally have 'no recorded ownership information.' On the other hand, 'registered shares' are securities 'recorded in the issuer's books.'" *Good Fortune Shipping SA v. Comm'r of Internal Rev. Serv.*, 897 F.3d 256, 259 (D.C. Cir. 2018) (quoting *Registered Shares*, Black's Law Dictionary (10th ed. 2014)). Delaware corporations cannot issue bearer shares. 8 *Del. C.* § 158 ("A corporation shall not have power to issue a certificate in bearer form."). Accordingly, a subsequent purchaser may only take control of stock in a Delaware corporation when there has been either an "effective indorsement" of the security or the issuer registers the transfer.

"'Indorsement' is defined as a signature made on a security certificate or separate document for purposes of transferring or redeeming the security." 6 *Del. C.* § 8-102 cmt. 11. In order for an indorsement to be effective, it must be made by

the "appropriate person," "by a person who has power under the law of agency to transfer the security or financial asset on behalf of the appropriate person," or by another, if "the appropriate person has ratified it or is otherwise precluded from asserting its effectiveness." 6 *Del. C.* § 8-107. The UCC defines an "appropriate person" as one, with respect to indorsement, that is "specified by a security certificate or by an effective special [i]ndorsement to be entitled to the security." *Id.* § 8-107(a)(1).

The original stock certificate specifies that PDVSA is the owner of the shares and specifies that the shares are "transferrable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly indorsed."[88] The reverse side of the certificate, which contains an assignment provision with blanks for signatures, names, and dates, states: "NOTICE: The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular without alteration or enlargement, or any change whatever."[89]

---

[88] Compl. Ex. A. PDVH admits that Exhibit A to the Complaint is a true and correct copy of the original stock certificate. Ans. ¶ 7.

[89] Compl. Ex. A.

PDVH has not been asked to register a transfer of shares on its books, which continue to reflect that PDVSA owns 100% of PDVH's outstanding stock.[90] After this court's decision in *Jiménez*, recognizing that Guaidó government's authority over PDVSA, the Maduro regime could not have validly transferred the PDVH shares.[91] Under the UCC, such transfer could not have been made to a protected purchaser, as the shares have not been transferred on PDVH's books and neither the Maduro regime nor its agents would be an "appropriate person" to effectively indorse a transfer. PDVH does not contend otherwise. Although it holds out the theoretical possibility that the Maduro regime could have transferred the shares prior to the *Jiménez* decision, it concedes that such an implausible scenario is both contrary to the evidence and illogical.[92] Rather, PDVH insists on a substantial bond based on the theoretical possibility that the Maduro regime may have pledged the shares.[93] But any pledge made after the *Jiménez* decision in August 2019 would be made with constructive notice that any debtor, other than the Guaidó regime, could

---

[90] Ans. ¶ 5; *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 177.

[91] Def.'s Reply Br. 5–6.

[92] Dkt. 49, Tr. 17:20–18:8 (PDVH's counsel acknowledging that (1) the Maduro government previously stated in pleadings that it had not sold the shares; (2) a purchaser of the shares would likely have come forward at some point in these proceedings; and (3) acknowledging that it is "unlikely that a purchaser would have paid a billion dollars or more to purchase shares without ever trying to register them and without ever taking any steps to assert that ownership").

[93] *Id.* at 17:11–19.

not rightfully pledge the assets. 4 Cox & Hazen § 28:6 n.13 ("Either actual or constructive notice will suffice to prevent one from obtaining the status of bona fide purchaser."). As PDVH itself argued in proceedings before the Delaware District Court, "any pledge that was done after the change in Government would be unauthorized and be void."[94] Accordingly, the recipient of a pledge after this period would not be a protected purchaser.

The only way that there could be a protected purchaser for the stock certificate is if the Maduro regime, while still in control of PDVSA prior to 2019, pledged or transferred the stock certificate. To support PDVH's theory, the pledge or transfer must have occurred at least four years ago. This too is an untenable proposition given the circumstances of this case. First, PDVH admits that it is not aware of any such pledge or transfer of the PDVH shares having been made.[95] Second, there is no documentation of any such pledge or transfer. Third, despite the existence of the long-running *Crystallex* litigation, these proceedings, and the notice provided by the parties pursuant to this court's orders, no person claiming any interest in the shares or the stock certificate has come forward.

---

[94] *Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 214, Tr. 77:10–19.

[95] *See* Dkt. 49, Tr. 19:4–12.

### 3. OFAC Sanctions

Even if it were possible under the UCC for the Maduro regime, or another with physical possession of the stock certificate, to pledge or transfer the certificate, such a transaction would violate OFAC sanctions. 31 C.F.R. § 591.407 ("[T]he enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to [regulation], is prohibited unless authorized pursuant to a specific license issued by OFAC."). Absent a license, OFAC regulations prohibit any sale or pledge of the PDVH shares and render any purported transfer null and void. 31 C.F.R. § 591.201–02.

PDVH argues that only United States citizens are bound by OFAC sanctions and insinuates that Maduro or his affiliates may have encumbered the shares in a transaction with a country which is not "particularly concerned about compliance with U.S. law."[96] This argument smacks of tactical expediency considering that the Venezuelan parties argued to the Delaware District Court that no bond should issue to protect Crystallex's interest in the shares pending an appeal in the Crystallex Action because the OFAC sanctions were sufficient.[97] The presence of the OFAC

---

[96] Def.'s Reply Br. 6.

[97] *See Crystallex International Corp. v. Bolivarian Republic of Venezuela*, C.A. No. 1:17-mc-00151-LPS (D. Del.), Dkt. 98 at 17 ("Crystallex has adequate security because the

41

sanctions undercut an argument that the stock certificate has been validly transferred or pledged in the last four years.

### 4. Prior Pledges

PDVH next argues that a prior pledge of the PDVH shares is possible because PDVSA has previously pledged shares in its indirect subsidiaries. In 2016, PDVSA, still controlled by Maduro, announced a proposed bond swap through which noteholders could tender unsecured notes due in 2017 in exchange for new notes due in 2020 and secured by a 50.1% interest in CITGO Holding.[98] In 2016, PDVSA also entered into an agreement with Russian oil company Rosneft Trading, through which

---

Executive Orders operate as a restraint on the PDVH shares, providing Crystallex with sufficient protection during the pendency of PDVSA's appeal. A bond is thus unnecessary.").

[98] Vera Aff. ¶ 7. Maduro declared a "State of Exception and Economic Emergency" in May 2016 in which he claimed the right to unilaterally execute public interest contracts. *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 462 (2d Cir. 2022). Pursuant to this power, Maduro purported to authorize PDVSA to enter into new notes due in 2020 (the "2020 Notes"). *Id.* The National Assembly responded with a resolution rejecting Maduro's declaration of power, invoking its right to approve public interest contracts under the Venezuelan Constitution and warning that Maduro's actions were null and void. *Id.* PDVSA nevertheless announced an exchange offer on September 17, 2016, and the National Assembly passed a second resolution seeking to reject the pledge of CITGO Holding stock as collateral. *Id.* at 462–63. After the United States recognized Guaidó as Venezuela's interim president, the Guaidó-appointed directors of PDVSA, PDVSA Petróleo, S.A., and PDVH filed an action in the United States District Court for the Southern District of New York, seeking a declaration that the 2020 Notes were invalid, illegal, null and void *ab initio*, and unenforceable because the agreements were not authorized by the National Assembly. Def.'s Reply Br. Ex. G. The court ultimately declined to find the notes and related documents unenforceable, entering a judgment of more than $1.9 billion in favor of the lenders. *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, C.A. 1:19-cv-10023-KPF (S.D.N.Y.), Dkt. 229. That judgment is currently on appeal. *Id.* at Dkt. 232.

42

PDVSA purported to guarantee one of its subsidiary's oil shipment obligations to Rosneft via a pledge by PDVH of the remaining 49.9% of the CITGO Holding Stock.[99] Yet even PDVH "does not concede or recognize the validity of these pledges."[100] PDVH also points to PDVSA's pledge of 50.1% of CITGO Holding stock in October 2016 to secure bond obligations of approximately $3.37 billion.[101]

These prior pledges do not support PDVH's speculation that the Maduro regime may have secretly pledged the PDVH stock. None of the aforementioned pledges involved PDVSA's stock of PDVH. In addition, these matters were highly publicized and were the subject of extended discussion before the Venezuelan National Assembly as well as litigation shortly after U.S. recognition of the Guaidó government. And the pledge of the CITGO Holding stock to secure the Rosneft loan was disclosed in a Delaware UCC filing dated November 30, 2016.[102] There was no attempt to hide the fact that this pledge had occurred, which was publicly disclosed

---

[99] Vera Aff. ¶ 8.

[100] *Id.* ¶ 9.

[101] *Petróleos de Venezuela, S.A. v. MUFG Union Bank*, C.A. No. 1:19-cv-10023 (S.D.N.Y.), Dkt. 1 ¶ 41.

[102] Def.'s Reply Br. Ex. I (noting that a filing was made in Delaware); *PdV pledges half of Citgo for Rosneft loan*, Argus Media Group (Dec. 23, 2016), https://www.argusmedia.com/en/news/1374742-pdv-pledges-half-of-citgo-for-rosneft-loan ("As first reported by *Redd Intelligence* yesterday and confirmed independently by *Argus*, a Delaware Uniform Commercial Code filing dated 30 November shows that Citgo parent PdV Holding negotiated a deal that would transfer almost half of Citgo's equity to Rosneft in the event of a PdV default on the debt.").

in Delaware, where the stock of CITGO Holding, a Delaware corporation, was located. If a pledge was made of PDVH stock, it is likely that the same procedure would have been followed. The facts and circumstances of these prior pledges cut against any inference that an undetected pledge of PDVH may have occurred.

The fact that the stock of other subsidiaries has been pledged in publicly debated transactions does not support an inference that PDVH's stock has been pledged in a clandestine manner, evading detection for years. PDVSA and PDVH have been involved in several high-profile litigation proceedings, including the *Jiménez* case in this court and the Crystallex Action in its various iterations. PDVH asks the court to suspend disbelief and to assume that a creditor with valid claims to billions of dollars' worth of PDVH stock has been waiting in the wings through years of litigation, including a proceeding to levy on and sell all of PDVSA's stock in PDVH, and despite receiving notice that this case may affect their rights. This is simply not a realistic threat.

\* \* \*

PDVH asks this court to set a bond between $1 billion and $2 billion but puts forth no facts of record or realistic legal theories to support such a significant bond. Instead, PDVH asks this court to join it in speculating about what may have been, building its theory largely on illogical assumptions. To accept that invitation would be improper. The court must evaluate the facts and circumstances before it and

44

consider potential likelihood of actual harm. Having carefully considered the particular facts and circumstances of this case, and in the exercise of the court's discretion, the court concludes that a nominal, unsecured bond is appropriate. Accordingly, PDVSA shall post an unsecured bond of $10,000 within seven business days.[103] Upon the posting of the bond, PDVH shall issue a replacement stock certificate to PDVSA.

## III. CONCLUSION

PDVH has not demonstrated good cause for this court to decline to issue a replacement stock certificate to PDVSA. Accordingly, the relief sought in the Complaint is granted, and PDVSA's entitlement to a replacement stock certificate is conditioned upon its posting of an unsecured bond of $10,000 within seven business days.

---

[103] Court of Chancery Rule 89, as amended in 2021, repealed the requirement that bonds filed with the court take a specific form. PDVSA may file the bond in any commercially reasonable form.

45